**In re GARLAND COAL & MINING COMPANY, A Missouri Corporation, Debtor.**

**Bankruptcy No. FS 84–71M.**

United States Bankruptcy Court,
W.D. Arkansas,
Fort Smith Division.

July 18, 1986.

Allen W. Bird, II, Thomas P. Thrash, Rose Law Firm, Little Rock, Ark., Richard W. Noble, Joel Pelofsky, Kansas City, Mo., for debtor.

Isaac A. Scott, Jr., Little Rock, Ark., Gary M. Ford, Robert P. Gallagher, Groom and Nordberg, Chartered, Washington, D.C., for creditors.

## MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

On March 14, 1984, trustees of the United Mine Workers of America, 1950 Pension Trust, 1974 Pension Trust and 1950 Benefit Plan and Trust (1950 Benefit Trust), collectively the "Trusts" filed an involuntary petition under the provisions of chapter 7 against Garland Coal & Mining Company (Garland). On April 3, 1984, Garland filed an answer denying the allega-tions of the petitioning creditors. Garland filed a counterclaim for $1,000,000 as damages for allegedly filing the involuntary petition in bad faith. On July 30, 1984, the International Union United Mine Workers of America, District 21 United Mine Workers of America (UMWA), as representative for Mrs. Robert Stanford, Vernon Burchfield, Ray Menser, Everett Cox and Tony Williams, filed a petition to intervene as petitioning creditors pursuant to 11 U.S.C. § 303(c). An Order permitting the intervention was entered on October 1, 1984.

A schedule was filed on April 23, 1984, by the alleged debtor listing its creditors pursuant to Bankruptcy Rule of Procedure 1003(d). The schedules listed sixty-six creditors. The petitioning creditors were not included on the schedules.

The Court has jurisdiction over the adjudication proceeding and counterclaim which are both core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). The following will constitute the Court's findings of fact and conclusions of law as required by Bankruptcy Rule of Procedure 7052.

## I

## BACKGROUND

Garland is a Missouri corporation authorized to do business in Arkansas. Joseph F. Porter III (Mr. Porter) is the Vice President and a substantial shareholder of Garland. In January 1981, Garland operated four coal mines located in Bokoshe, Rose Hill, and Stigler, Oklahoma, and Charleston, Arkansas. Garland was a signatory to the 1974 and 1978 National Bituminous Coal Wage Agreements (Wage Agreements) with the United Mine Workers of America labor union.

In recent years, Garland has experienced business difficulties. In 1974, Garland sold the underground coal reserves of the Bok-

oshe mine to CF & I, a steel corporation. The Bokoshe location was a surface mine and was "mined out" sometime in August 1982, at which time Garland ceased mining operations there. Garland substantially completed the required reclamation work by early fall of 1984. The Rose Hill and Stigler mines, which were surface coal mines, were sold to Alpine Construction Company (Alpine) in 1982. The Charleston mine was the only mine owned by Garland the day the involuntary petition was filed. The Charleston mine has not been operated since September 1982. According to Garland's witness, Mr. Porter, the Charleston mine was not being operated because the market price for low volatile, high sulfur coal was too low for the mine to be feasibly operated.

Garland also experienced labor difficulties. In March 1981, Garland's operations were subject to a strike by the United Mine Workers of America. The strike was settled in September 1981 as part of a nationwide settlement. The Wage Agreements expired. Garland and the United Mine Workers reached an impasse; no new agreement was ever executed.

## II

### CLAIMS OF 1950 AND 1974 PENSION PLAN

Among the provisions of the 1974 and 1978 wage agreements was an obligation by Garland to make contributions to the 1950 Pension Trust and the 1974 Pension Trust. These trusts are governed by the Employee Retirement Income Security Act of 1974 (ERISA), as amended.

The 1950 Pension Trust is funded by contributions of employers based on tons of coal mined. Contributions from employers to the 1974 Pension Trust are based on certain dollar amounts per ton of coal and certain dollar amounts per hour of labor by union employees. Typically, contributions by employers are sent to Mellon Bank along with a remittance advice document. Mellon Bank deposits the contributions to the respective trust accounts. The remit-tance advice form and proof of the deposit are used to post the individual employer's account. Garland made contributions to both the 1950 Pension Trust and the 1974 Pension Trust until it determined to cease making contribution.

Multi-employer pension plans are subject to the regulations of 29 U.S.C. § 1381, *et seq.* If an employer who is a contributor of a plan withdraws from the plan, a "withdrawal liability" is created. The procedures under 29 U.S.C. § 1381, *et seq.* are discussed succinctly by the court in *T.I.M. E.–DC, Inc. v. Management-Labor W. & P. Funds Etc.*, 756 F.2d 939, 946 (2nd Cir. 1985), as follows:

Section 1399(b)(1) is the heart of the notice and collection scheme in Part One. It states that:

As soon as practicable after an employer's complete or partial withdrawal, the plan sponsor shall—

(A) notify the employer of—

(i) the amount of the liability, and

(ii) the schedule for liability payments, and

(B) demand payment in accordance with the schedule.

The most significant aspect of the notice scheme is that no matter what disputes arise between the old plan sponsor and the employer over the amount of liability, the employer is obligated to pay the withdrawal liability demanded as soon as the plan sponsor has provided notice of the payment schedule under § 1399(b)(1).

In its earlier drafts, Congress provided for an informal review process to occur before the plan sponsor demanded payment. The plan sponsor could demand payment only after the employer had a 'reasonable opportunity to identify any inaccuracy in the determination of its withdrawal liability or the schedule of payments' and after the plan sponsor responded to the matters raised by the employer. *Multiemployer Pension Plan Amendments Act of 1980: Hearings on H.R. 3904 Before Subcomm. on Labor-Management Relations of the House Comm. on Education and La-*

*bor,* 96th Cong., 1st Sess. 24, 26 (1979) (§ 4201(e)(f)(2) and (3) of draft of MPPAA). But just before passing the Act, Congress redrafted it to allow the plan sponsor to demand payment before review occurred, and thereby avoid delay in the commencement of an employer's payment of its withdrawal liability. Congress made the requirement that the employer promptly pay its withdrawal liability obligations crystal clear in § 1399(c)(2):

> Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor under subsection (b)(1) of this section beginning no later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.[1]

The PBGC has ameliorated the potential harshness of this pay-first-question-later system by providing that the employer shall not be considered in default until the sixty-first day after the review and arbitration process is complete. PBGC regulations, 29 C.F.R. § 2644.2(c) (1984). The employer is still liable for payment during the review and appeal period, and interest accrues during that period, but the plan sponsor cannot consider the employer to be in default and accelerate its demand for the entire payment. The employer can also put its withdrawal liability into an escrow account, or pay the plan sponsor on time and get back any overpayment with interest. *See* 29 C.F.R. § 2644.2(d). TIME–DC has paid its withdrawal liability into an escrow account.

The transfer provisions of § 1415 do not alter this Congressional aim of re-quiring the employer to begin paying according to the plan sponsor's § 1399(b)(1)(B) demand. Under § 1415 the old and new plans must agree on the amounts of assets and liabilities that should be transferred from the old to the new plan. Once they have agreed, the old plan sponsor, in calculating the employer's withdrawal liability, must compute the amount by which the employees' unfunded vested benefits transferred exceeds the value of employer contributed assets transferred to determine by what amount it must reduce the withdrawal liability. § 1415(c). Then, if the old plan sponsor has already calculated the withdrawal liability and demanded payment, it must compare the actual amounts to be transferred to the new plan with the amounts, if any, it estimated under § 1391(e) in determining the withdrawal liability and adjust the employer's withdrawal liability accordingly.

As with § 1399, the fact that the new plan or the employer disputes the amount that the old plan proposes to transfer does not relieve the employer of its obligation to pay the withdrawal liability according to the payment schedule set by the sponsors of the old plan. If the new plan appeals to the PBGC and the employer is required to pay its withdrawal liability before the appeal is settled (unless 180 days has elapsed since the filing of the appeal), then the employer must pay its withdrawal liability in escrow. § 1415(d). The old plan will return any overpayment to the employer with interest. Amounts received by the old plan will be credited against the withdrawal liability due. *Id.* Thus § 1415 supports the requirement that the employer begin paying its withdrawal liabili-

---

**1.** When the statute refers to 'review' it means the informal review process outlined in § 1399(b)(2)(A) under which the employer, no later than 90 days after it receives the plan sponsor's § 1399(b)(1) notice, may ask the plan sponsor to review the determination to correct any inaccuracy. Section 1399(b)(2)(B) directs the plan sponsor to respond to the employer's request 'after a reasonable review of any matter raised.' The 'appeal' refers to the formal arbitration proceedings provided for in § 1401. *See* § 1401(d) ('Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination').

ty even though there is a dispute over the precise amount due. Compliance with § 1415 is not, as TIME–DC contends, a precondition to the payment of withdrawal liability.

Both the 1950 Pension Trust and the 1974 Pension Trust assessed Garland with withdrawal liability and demanded payment. The withdrawal liability assessed by the 1950 Pension Trust was contained in a letter from the 1950 Pension Trust dated April 14, 1982. Withdrawal liability was assessed in the amount of $1,840,875.18. The monthly interim payments alleged to be due under this assessment were in the amount of $30,330.02. Payments were due beginning on or before June 23, 1982. Garland made payments to the 1950 Pension Trust for June 23, 1982, and August 1982 through November 1983.

The withdrawal liability assessed by the 1974 Pension Trust was contained in a letter from the 1974 Pension Trust dated April 14, 1982, and was in the amount of $1,822,548.40. The monthly interim payments alleged to be due under this assessment were in the amount of $24,594.35. Garland made payments to the 1974 Pension Trust for June 23, 1982, and for August 10, 1982 through November 10, 1983.

Garland utilized the informal review procedure permitted by the statute and, as a result, the amount of the withdrawal liability to the 1974 Pension Trust was not changed, but the amount of the interim payments was reduced from $24,594.35 to $18,261.05 per month. At the time the involuntary petition was filed, Garland was in arrears for the interim payments to the 1950 Pension Trust four payments totalling $121,320. The arrearage to the 1974 Pension Trust at this same time was $72,800.

## III

### ONE CREDITOR IS SUFFICIENT TO INITIATE THE INVOLUNTARY PETITION

11 U.S.C. § 303 sets forth the requirements for obtaining an involuntary order of relief under chapter 7 or 11 of the United States Code, Title 11. Generally, if there are twelve or more qualified creditors of the alleged debtor holding unsecured claims aggregating more than $5,000, the petition must be brought by three or more creditors. The petitioning creditors must prove that the alleged debtor is generally not paying its debts as such debts become due and that the debts are not the subject of a bona fide dispute.

If the alleged debtor has fewer than twelve creditors, an involuntary petition may be brought by one creditor. For purposes of the twelve creditor rule, a creditor will not be counted if the creditor is an insider or an employee of the alleged debtor or if the creditor is a transferee of a transfer voidable under 11 U.S.C. § 544, 545, 547, 548, 549 or 724(a).

Garland listed sixty-six creditors on its schedules, not including the Trusts or the UMWA's claim on behalf of Mrs. Robert Stanford, Vernon Burchfield, Ray Menser, Everett Cox and Tony Williams. All of the sixty-six creditors were paid in full or on account either before or after the petition was filed.

■■■ The number of creditors is to be determined as of the date the petition is filed. *Matter of Skye Marketing Corp.*, 11 B.R. 891 (Bkrtcy.E.D.N.Y.1981). *See also In re Blaine Richards & Co., Inc.*, 10 B.R. 424 (Bkrtcy.E.D.N.Y.1981); *Matter of International Teldata Corp.*, 12 B.R. 879 (Bkrtcy.D.Nev.1981). Those creditors who were paid in full before the petition was filed are not creditors on the day the petition was filed, and none may be counted for purposes of the twelve creditor rule. The payments made to creditors after the petition was filed are subject to being set aside pursuant to 11 U.S.C. § 549 as unauthorized payments of prepetition unsecured debts. 2 *Collier on Bankruptcy* ¶ 303.08 (15th ed. 1984). The remaining creditors who were listed held postpetition claims and do not qualify. The claims of the UMWA, whether considered as one claim or five claims, are not counted because they are claims by employees of the alleged debtor. 11 U.S.C. § 303(b)(2). The only

remaining creditors to be counted are the three petitioning creditors.

■ Because there are fewer than twelve creditors which are eligible to be counted, the petition may be initiated by one creditor holding an unsecured claim of at least $5,000 which is not subject to a bona fide dispute. 11 U.S.C. § 303(b)(1) and (2).

IV

### THE CLAIMS OF THE PETITIONING CREDITORS ARE NOT SUBJECT TO A BONA FIDE DISPUTE

■ Garland asserts that the claims of the 1950 and 1974 Pension Trusts are the subject of a bona fide dispute which was pending before an arbitrator at the time the petition was filed. Garland argues that because the assessment of withdrawal liability was mechanically performed by the staff of the Trusts rather than the trustees themselves, there has been no valid assessment to trigger the obligation to make interim payments. Garland cites as authority for this argument the case of *T.I.M.E.–DC, Inc. v. Truck. Emp. of N.J. Wel. Fund*, 560 F.Supp. 294 (E.D.N.Y.1983).

Assuming this issue has properly been raised in the pleadings, the facts in *T.I.M.E.* do not warrant any inference that the assessment by the trusts' staff was invalid. Nothing in the case supports the argument that the liability assessment procedures are invalid. Garland admitted that it had been assessed withdrawal liability in pleadings filed in this Court.

The petitioning creditors assert that Garland withdrew from the 1950 Pension Trust and the 1974 Pension Trust as of a certain date. Garland argues that the withdrawal date is also subject to a bona fide dispute, however, no evidence of facts supporting the contentions of the parties was offered.

Mr. Porter testified that he had been advised that there are legal theories which, if adopted, could result in an adjudication of no further withdrawal liability against Garland. Counsel for Garland also elicited some testimony on cross-examination concerning a theoretical basis for adjusting Garland's liability. The petitioning creditors' evidence established that withdrawal liability had been assessed and some payments had been made, and cited the statute which requires the payments to be made.

■ Prior to the 1984 amendments to the Bankruptcy Code, some courts held that holders of disputed claims were permitted to be petitioning creditors. *In re Dill*, 731 F.2d 629 (9th Cir.1984); *In re Marshall*, 37 B.R. 108 (Bkrtcy.S.D.Fla.1984). Other courts ruled that holders of disputed claims could not be petitioning creditors. *In re B.D. Inter. Discount Corp.*, 701 F.2d 1071 (2nd Cir.1983), *cert. denied*, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983).

Section 303(b)(1) was amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 and now provides that an involuntary case may be commenced against a debtor by "a holder of a claim that is not ... the subject of a bona fide dispute." Since the 1984 amendment, several courts have considered the question of what constitutes a bona fide dispute. The court in *In re Johnston Hawks, Ltd.*, 49 B.R. 823, 830 (Bkrtcy.D.Hawaii 1985) stated that:

> [a] bona fide dispute is a conflict in which an assertion of a claim or right is made in good faith and without fraud or deceit on one side is met by contrary claims or allegations made in good faith and without fraud or deceit on the other side.

In determining whether a claim was subject to a bona fide dispute, the *Johnston Hawks'* court considered the following factors:

1. The nature of the dispute;

2. The nature and the extent of the evidence and allegations presented in support of the creditor's claim and in support of the debtor's contrary claims;

3. Whether the creditor's claim and the debtor's contrary claims are made in good faith and without fraud or deceit;

4. Whether on balance the interests of the creditor outweighs those of the debtor.

*In re Johnston Hawks, Ltd.*, 49 B.R. at 831.

Analogizing to a motion for summary judgment, the court in *In re Stroop*, 51 B.R. 210, 212 (D.Colo.1985) discussed the standard in determining whether a claim is subject to a bona fide dispute as follows:

If the defense of the alleged debtor to the claim of the petitioning creditor raises material issues of fact or law so that a summary judgment could not be rendered as a matter of law in favor of the creditor on a trial of the claim, the claim is subject to a bona fide dispute.

After rejecting the approaches in the *In re Stroop* and *Johnston Hawks* cases, the court in *In re Lough*, 57 B.R. 993, 997 (Bkrtcy.E.D.Mich.1986) concluded that the proper definition of bona fide dispute is "whenever there is any legitimate basis for the debtor not paying the debt, whether that basis is factual or legal." This Court is persuaded that *In re Lough* correctly states a proper definition of the "bona fide dispute" test.

■ The petitioning creditors have established a prima facie case that the claim of the 1950 and 1974 Pension Trusts were not subject to a bona fide dispute, and the burden of coming forward with evidence of a bona fide dispute shifted to the alleged debtor. *See In re Reid*, 773 F.2d 945 (7th Cir.1985). There is, of course, a fundamental difference between a dispute based solely on the contentious nature of a litigant and a bona fide dispute. Garland does not establish a bona fide dispute by merely showing that it demanded and received its right of arbitration under the statute. Garland has no legitimate basis under the statute to decline to pay the interim payments. *Lads Trucking Co. v. Board of Trustees*, 777 F.2d 1371 (9th Cir.1985). The reason for Garland's cessation of the interim payments was insufficient cash, rather than a bona fide dispute that interim liability existed.

■ Since this Court has concluded that the claims of the 1950 and 1974 Pension Trusts are not subject to a bona fide dispute, and that the petition may properly be brought by one creditor, it is not necessary to consider whether the claims of the 1950 Benefit Trust for Black Lung benefits and the UMWA are subject to bona fide disputes.

V

## GARLAND WAS GENERALLY NOT PAYING ITS DEBTS AS THEY BECAME DUE

■ The remaining issue is whether Garland, at the time the petition was filed, was generally not paying its debts as they became due. 2 *Collier on Bankruptcy* ¶ 303.12 (15th ed. 1985) states as follows:

Although the precise scope and meaning assigned to the term 'generally not paying' are left to the courts, it is clear that a court must find more than a prospective inability by the debtor to pay only a few of his debts, and more than a past failure to pay a few liabilities. It is doubtless intended that a court should properly consider both the number and amount of debts in determining whether failure to pay is in fact general.

Courts which have considered this issue review a variety of factors including the nature and conduct of the alleged debtor's financial affairs. *In re Reed*, 11 B.R. 755 (Bkrtcy.S.D.W.Va.1981); *In re Midwest Processing Co.*, 41 B.R. 90 (D.N.D.1984). In defining "generally not paying its debts," the *Reed* Court stated that:

a purely mechanical test will not reveal whether a debtor is generally not paying his debts. Courts have used four factors in making this determination: the number of debts, the amount of delinquency, the materiality of nonpayment and the nature of the debtor's conduct of his financial affairs.

A debtor must neglect more than one debt for the nonpayment to be general, unless there are exceptional circumstances (citations omitted). Ordinarily, for the

number of debts to have any significance in the determination, the number not paid each month must be compared to the number which were paid. The ratio of unpaid to accruing debts is more revealing than a simple count of unsatisfied creditors.

*In re Reed,* 11 B.R. at 759, 760.

In addition, *Reed* considered the materiality of nonpayment of debts and the basis for nonpayment, reasoning that a bona fide dispute or a commercial practice. might justify nonpayment by the debtor. Finally, in considering nonpayment, *Reed* reviewed the debtor's overall handling of his financial affairs "to ensure that the debtor was operating in good faith and in the regular course of business." *In re Reed,* 11 B.R. at 760. Nonpayment of a few large debts has been held sufficient to warrant an order of relief. *Matter of International Teldata Corp.,* 12 B.R. at 879; *Matter of Bowers,* 16 B.R. 298 (Bkrtcy.D.Conn.1981); *Hill v. Cargill,* 8 B.R. 779 (D.Minn.1981). Here, although the debtor prepetition was paying most of its creditors in number, the total debt which it was not paying as the debts became due was well over fifty percent of the outstanding liabilities.

The Court is mindful of the admonition by the Eighth Circuit Court of Appeals against involuntary petitions brought by a single creditor in the case of *In re Nordbrock,* 772 F.2d 397 (8th Cir.1985). *Nordbrock* is factually distinguishable since there are at least two petitioning creditors, 1950 Pension Trust and 1974 Pension Trust, who are eligible to bring this petition against Garland. Further, Garland is not operating its business. Garland's main source of cash is from the sale of its capital assets. The liability to make the interim payments to two of the petitioning creditors is not legally disputable, and the amount of the two payments constitutes a significant percent of Garland's current liabilities. Garland discontinued the interim payments because of insufficient cash, and Garland's net worth has declined steadily and significantly over the last several years. All of these factors were absent in *Nordbrock.*

Considering all of the foregoing, Garland was generally not paying its debts as they became due at the time the involuntary petition was filed.

Other arguments raised by Garland have been considered although not discussed separately. The Court finds these arguments unpersuasive and unnecessary for further discussion.

## VI

## CONCLUSION

Garland Coal & Mining Company is adjudged a debtor under chapter 7. The counterclaim of Garland is dismissed. The Clerk of the Bankruptcy Court is directed to appoint an interim trustee from the panel of trustees. The debtor is ordered to file chapter 7 schedules and statement of affairs within thirty days from the entry of this memorandum opinion and judgment of this same date.

IT IS SO ORDERED.