**In re Robin LEACH, Debtor.**

**Bankruptcy No. 88–20238–7I.**

United States Bankruptcy Court, D. Kansas.

Oct. 24, 1988.

Daniel A. Duncan, Donald E. Bucher, Gould & Moore, P.C., Kansas City, Kan., for Lawrence Nat. Bank.

Carol Park Wood, Wichita, Kan., Trustee.

F. Stannard Lentz, Overland Park, Kan., Edward L. Bailey, Cosgrove, Webb & Oman, Topeka, Kan., for debtor.

## MEMORANDUM OPINION AND ORDER

BENJAMIN E. FRANKLIN, Chief Judge.

This matter came for hearing on July 25, 1988, to determine whether an order for relief should be entered in response to the filing of an involuntary petition in bankruptcy. The petitioning creditor, Lawrence National Bank & Trust Company, appeared by and through counsel, Donald E. Bucher. The respondent, Robin Leach, appeared in person and through counsel, F. Stannard Lentz and Edward L. Bailey.

### FINDINGS OF FACT

Based upon the testimony, the exhibits, and the record, this Court finds as follows:

1. The respondent-alleged debtor, Robin Leach, was formerly a farmer, a rancher, and a dairyman from Linwood, Kansas. In 1979, Leach began financing his farm, cattle, and dairy operations through Lawrence National Bank and Trust Company.

2. In 1984, the United States instituted a diversion program for dairy farmers. Under the diversion program, the U.S. compensated participating farms for, in effect, not selling milk products. Leach anticipated that he could receive approximately $50,000 to $60,000 through this program.

3. In order to generate additional income, it was the desire of Leach to establish a plan to use the unsalable diversion program milk products on his farm. To this end, he developed a plan which he termed "an embryo transfer program," flushing embryos of certified Holsteins to implant into his regular herd, thereby increasing the yield of certified cattle. He planned to use the diversion program milk products to feed the new calves.

4. The following is Leach's version of what occurred next with the program and of how he subsequently fell into financial demise:

a. Leach consulted with officers of the Bank, specifically a Mr. Eaton, for assistance and advice in establishing the embryo transfer program.

b. The embryo transplant program would require an initial outlay of $80,000.00 to $100,000.00 plus expenses for veterinarians, feed, registration, additional pasture land, and the acquisition of pure bred cattle.

c. The Bank agreed to finance the initial expense, utilizing the diversion funds for debt service and reduction; control all income and allocate expenses to itself and the creditors of respondent; and modify and rearrange respondent's debt to the Farmers Home Administration (FHA) because the diversion subsidy would not initially cover debt service.

d. Leach and the Bank understood that the full development of the diversion and embryo transplant programs would require approximately a three-year period of time. Periodic sales of cattle would provide funds to cover various expenses. The Bank represented to Leach that it would provide financing until such time as the diversion and embryo transfer programs would provide a return on investment.

e. The Bank realized that the diversion money would not be sufficient for debt service. Therefore, Eaton contacted the FHA for waiver of payment of the FHA obligation. The FHA agreed to waive payment from April of 1984 to June of 1985. The Bank agreed to allow Leach to pay to FHA from cattle sales payments in the amount of $15,240.00 due January of 1985 and $7,620.00 due May of 1985 with payments to the FHA to resume after May of 1985. The FHA also agreed to accept a security interest in the cattle to the extent of its waiver of payments. However, the FHA never received that security agreement from the Bank. Leach's obligation to the FHA eventually went into default because the Bank refused to allow Leach to make either the January 1985 or May 1985 payment from cattle proceeds.

f. In 1984, Mr. Eaton was succeeded by Mr. White. Mr. White insisted periodically that Leach sell cattle even though prices were at low levels and the sales did not result in significant debt reductions.

g. Because of such low prices, Leach insisted that he retain some cattle for later disposition and sale. The Bank advised Leach to lease additional pasture land and agreed to finance the lease of such pasture. Leach located pasture in Wabaunsee County. The Bank told Leach to pay for the land with a check which the Bank promised to honor. The Bank subsequently refused to honor the check with the result that Leach had to cover the rent with his own money in order to avoid default on the lease and removal of his cattle.

h. In the fall of 1984 the remaining steers at pasture were sold with the proceeds made payable to Leach and the Bank. The Bank told Leach that the proceeds would be applied to his debt to the Bank and for the January payment to the FHA. The Bank then applied all the proceeds to reduction of its own loan leaving Leach in default with the FHA and possessing no means of making good on his January payment to the FHA.

i. During this same period of time, the Bank advised Leach to obtain feed for the herd through Gro–Rite Feeds of Leavenworth. The Bank advised both Leach and agents of Gro–Rite that payments for the feed advanced would come from the proceeds of the sale of cattle. These proceeds were controlled entirely by the Bank. Gro–Rite provided feed to the herd based upon such representations made by the Bank. The Bank subse-

quently refused to pay Gro–Rite from such proceeds from the sale. Gro–Rite then refused to supply any further feed to Leach and brought suit against Robin and Lana Leach eventually obtaining judgment.

j. After Gro–Rite refused to provide additional feed, the Bank advised Leach to obtain feed from North Co-op Elevator. The Bank guaranteed North Co-op payment for feed advanced. The Bank subsequently refused to pay the Co-op and Leach was unable to obtain feed for the cattle. Eventually and under duress, Leach told Bank that he would have to surrender the cattle to Bank since he was unable to obtain feed for them. The Bank has not accounted for such cattle to Leach.

k. As a result of the Bank's failure to abide by its agreement to finance the diversion and embryo transfer programs to fruition, Leach's farm was eventually sold at the request of the FHA with proceeds used to reduce the debt to the FHA leaving a sizable deficiency. The sale and subsequent deficiency was necessitated solely by reason of the Bank's refusal to pay the expenses of the diversion and embryo transfer programs and to honor its agreement to finance these programs to fruition.

l. During this time period, all checks from the proceeds from cattle sales were made jointly to Leach and the Bank. Thus, the Bank had complete control of all proceeds from cattle sales. Leach was dependent upon Bank for the payment of expenses from such proceeds. The Bank refused to cover these expenses without notice and contrary to its prior representations.

5. In early March of 1986, Donald E. Bucher on behalf of the Bank, filed a petition against Leach in the District Court of Leavenworth County, Kansas, seeking to collect on two separate promissory notes in the original principal amounts of $378,-457.21 plus interest of $48,291.26. On March 25, 1986, F. Stannard Lentz filed an entry of appearance in that case. Leach did not file an answer or counterclaim at that time.

6. In the summer of 1986, Leach and his counsel, Lentz, entered into negotiations with the Bank and Leach's three other largest creditors attempting to work out a settlement. Leach had hoped to negotiate a settlement with all four creditors. He reached a tentative settlement with the Bank and began making payments. However, Leach ceased making payments when he was unable to settle with the other creditors.

7. The District Court of Leavenworth County dismissed the Bank's petition for lack of prosecution in September of 1986.

8. On October 8, 1987, Edward Bailey, another attorney for Leach, wrote a letter to the Bank asserting a cause of action based on a lender's liability theory.

9. On November 19, 1987, the Bank filed another petition against Leach in the District Court of Leavenworth County alleging default on the two promissory notes. On December 3, 1987, the respondent filed a detailed answer and a counterclaim.

10. The answer alleged that by reason of the Bank's bad faith conduct, the Bank should be estopped from any collection on the notes.

11. In addition, Leach counterclaimed for breach of contract, breach of good faith and fair dealings, misrepresentation, breach of fiduciary duty, and interference with business and contractual relationship.

12. On February 23, 1988, the Bank filed an involuntary chapter 7 petition against Leach.

### ISSUE

WHETHER OR NOT THE LAWRENCE NATIONAL BANK'S CLAIM AGAINST ROBIN LEACH (ALLEGED DEBTOR) IS SUBJECT TO A BONA FIDE DISPUTE WITHIN THE MEANING OF 11 U.S.C. § 303(b).

### CONCLUSIONS OF LAW

■ The phrase "bona fide dispute" has been interpreted by numerous bankruptcy

court decisions. Legislative history suggests that the language was aimed at preventing creditors whose claims are legitimately disputed from using the threat of an involuntary bankruptcy as a weapon to force debtors into paying those claims. 2 Collier on Bankruptcy 303.08[11][c] (15th ed. 1988). It has also been suggested that Congress wanted creditors to settle disputed claims outside of bankruptcy because involuntary bankruptcy is considered a severe remedy. *Id.*

Several courts have formulated differing standards for determining whether a debt is the result of a bona fide dispute. In *In re Stroop,* 51 B.R. 210 (D.Colo.1985), for example, the court looked to the same standards as those applicable to motions for summary judgment. The *Stroop* court stated:

> If the defense of the alleged debtor to the claim of the petitioning creditor raises material issues of fact or law so that summary judgment could not be rendered as a matter of law in favor of the creditor on trial of a claim, the claim is subject to a bona fide dispute.

*Id.* at 212. *See also In re Cates,* 62 B.R. 179, 181 (Bankr.S.D.Tex.1986) (adopted *Stroop* standard).

The court in *In re Johnston Hawks, Ltd.,* 49 B.R. 823, 831 (Bankr.D.Hawaii 1985) defined a bona fide dispute as one in which "an assertion of a claim or right made in good faith and without fraud or deceit on one side is met by contrary claims or allegations made in good faith without fraud or deceit on the other side. The court listed several standards to be considered: (1) the nature of the dispute; (2) the nature and the extent of the evidence and allegations presented in support of the creditor's claim and in support of the debtor's contrary claims; (3) whether the creditor's claim and the debtor's contrary claims are made in good faith and without fraud or deceit; and (4) whether in the balance the interests of the creditor outweigh those of the debtor.

However, both of these approaches were criticized in *In re Lough,* 57 B.R. 993, 996–97 (Bankr.E.D.Mich.1986). The court rejected the *Stroop* standard because it did not account for the possibility of undisputed facts but substantial dispute as to the proper application of law. The court also rejected the *Johnston Hawks* analysis because it was too subjective (requiring decisions on good faith, fraud and deceit) and also used a balancing of interests test for which there was no basis in the statute. Instead, *Lough* held that "if there is either a genuine issue of material fact that bears upon the debtor's liability or a meritorious contention as to the application of law to undisputed facts, then the petition must be dismissed." *Id.* at 830.

Other courts have since adopted the *Lough* standard. In *In re Busick,* 65 B.R. 630, 637 (N.D.Ind.1986), the court found *Lough* persuasive and stated:

> In light of the demise of the [matter of] *Covey* [650 F.2d 877 (7th Cir.1981) ] standard, questioned by the bankruptcy court, but implicitly acknowledged by the Seventh Circuit in [In Re] *Reid* [773 F.2d 945 (7th Cir.1985) ], this court finds the reasoning of *Lough* persuasive. The statute does not require the court to determine the outcome of any dispute, only its presence or absence. Only a limited analysis of the claims at issue is necessary. Therefore, the court adopts the standard set forth in *Lough:* a bona fide dispute as that term is used in sections 303(b) and 303(h) refers to a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts.

*See also In re B.B.S.I., Ltd.,* 81 B.R. 227, 230 (Bankr.E.D.N.Y.1987); *In re Garland Coal & Mining Co.,* 67 B.R. 514, 521 (Bankr.W.D.Ark.1986).

Likewise, this Court now adopts the *Lough* standard: a bona fide dispute as that term is used in section 303(b) refers to a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts. The statute does not require the Court to determine the outcome of any dispute, only its presence or absence. Only a limited analysis of the

claims at issue is necessary. *Busick*, 65 B.R. at 637.

In the present case, it is evident from the record that there are several genuine issues of material fact that bear upon Leach's obligation to pay the balance of the notes held by the Bank. These issues include: (1) whether the Bank agreed to give the FHA a security interest in cattle to the extent of the FHA's waiver of payment and further agreed to allow payments from cattle proceeds totaling $212,860.00 to be made during 1985; (2) whether the Bank agreed to honor checks written by Leach to Gro–Rite Feed for feed advanced for use in Leach's milk diversion and embryo transfer programs; (3) whether the Bank agreed to guarantee payment to North Co-op for feed; and (4) whether the Bank agreed to finance the milk diversion and embryo transfer programs until they reached a point of profitability.

In addition, this Court finds there are genuine issues of law: (1) whether the Bank's control of the income from the sale of cattle and payment of expenses created a fiduciary relationship between Leach and the Bank; (2) whether the Bank should be equitably estopped from collecting on the notes; and (3) whether the Bank and Leach created an enforceable contract.

This Court notes that the Bank contends that the above material questions of fact and law cannot be used in determining whether a bona fide dispute exists because they arise *solely* out of Leach's counterclaim. More specifically, the Bank argues that "[c]ounterclaims serve, if established, to work a diminution or set-off of the claim of the petitioning creditor, either as part of the code Section 303(b)(1) analysis of the petitioner's claim or as part of the code Section 303(h)(1) analysis of generally not paying, in which the *amount* (not eligibility) of a petitioners claim may be relevant." (*See Petitioning Creditor's Memorandum of Law on Issue of Bona Fide Dispute*, pg. 7)

However, this Court need not address this issue because the Bank mischaracterizes Leach's defenses as solely arising out of a counterclaim. The Bank ignores the answer to the Bank's state court action in which Leach alleges that by reason of the Bank's bad faith conduct, the Bank should be estopped from any collection on the notes. Equitable estoppel is clearly an affirmative defense under F.R.C.P. 8(c) and not a counterclaim.

IT IS THEREFORE, BY THE COURT, ORDERED That an order for relief should *not* be entered in the involuntary bankruptcy against Robin Leach because the Lawrence National Bank's claim is subject to a bona fide dispute.

IT IS FURTHER, BY THE COURT, ORDERED That the involuntary bankruptcy proceeding is hereby DISMISSED.