**In re Omar Sharif AMANAT, Debtor.**

**No. 04–43361(ALG).**

United States Bankruptcy Court,
S.D. New York.

Jan. 19, 2005.

Eiseman, Levine, Lehrhaupt & Kakoy-iannis, By Eric R. Levine, Esq., New York, Co–Counsel for Petitioning Creditors Kevin Waltzer and Michael Sanderson.

Angel & Frankel, P.C., By Laurence May, Esq., New York, Co–Counsel for Petitioning Creditors Kevin Waltzer and Michael Sanderson.

Heller Ehrman White & Mcauliffe, By Dennis M. O'Dea New York, Counsel for Omar Sharif Amanat.

## MEMORANDUM OF DECISION

ALLAN L. GROPPER, Bankruptcy Judge.

On November 9, 2004, Jeffry Malonda filed an involuntary Chapter 7 petition against Omar Sharif Amanat ("Amanat") pursuant to § 303 of the Bankruptcy Code. Kevin Waltzer and Michael O. Sanderson (collectively with Malonda, the "Petitioning Creditors") later joined the petition. On November 29, 2004, Amanat answered the petition, denying the standing of the Petitioning Creditors to file an involuntary petition under § 303(b) and asserting that he is paying his debts as they become due and

is therefore not an appropriate subject for involuntary relief under § 303(h). For the reasons stated below, the Court finds that the Petitioning Creditors have met their burden under § 303 and that an Order for Relief should be entered in this Chapter 7 proceeding.

In order to understand the background to this matter, it is necessary to consider the history of a related proceeding involving one of Amanat's companies, MarketXT Holdings Corp. ("Holdings"). Accordingly, we first review the facts relating to the Holdings proceeding and then the facts relating to the claims of the Petitioning Creditors. We finally review the particular manner in which this case was commenced.

### Factual Background

**The MarketXT Involuntary Bankruptcy**

Amanat is a businessman who at one time had great success in the securities industry. He started as a broker and apparently later transitioned to creating electronic stock trading systems, eventually founding his own trading company. He formed Holdings as Tradescape.com and subsequently changed its name to Tradescape Corp. ("Tradescape"), then to MarketXT Holdings, T. Corp., and finally to Market XT Holdings Corp.[1] Holdings has two subsidiary companies, MarketXT Corp. and MKXT LLC (collectively with Holdings, the "MarketXT Companies"). It appears that at their height, the MarketXT Companies may have had as many as 35 offices, 750 employees and over $140,000,000 in annual sales. In June of 2002, Amanat (directly or indirectly) sold the operating companies to E*Trade Financial Corp. ("E*Trade") for consideration that included $100 million in E*Trade stock. Litigation relating to the

---

1. Amanat also refers to Holdings as Mark- etXT, Inc.

sale is said to be the most substantial asset of Amanat and of Holdings.

On March 26, 2004, Tanzman, Rock & Kaban LLC, Jonathan Tanzman, Mark Rock, Jared Kaban, Triton Global LLC, Adrian Au, Andrew Tong, and Ignacio Tzoumas filed an involuntary Chapter 7 petition against Holdings, alleging that it was not paying its debts as they came due. The petitioning creditors were later joined by Wollmuth, Maher & Deutsch, Leibert Corp., GE Capital Corp., Dennis Grossman, and Jill Valinsky (collectively the "Holdings Petitioning Creditors"). A hearing on the issues raised by the Holdings Involuntary Petition was adjourned many times on consent of the parties. Three of the Holdings Petitioning Creditors (Wollmuth, Maher & Deutsch, Valinsky, and Leibert) apparently reached agreement with Holdings and withdrew their support of the petition.

On June 6, 2004, almost three months after the involuntary petition was filed, Holdings moved to dismiss the bankruptcy. Waltzer, a creditor of both Holdings and Amanat, joined in the motion to dismiss at that time so as to continue pursuing his remedies in State court. This motion was itself adjourned several times, and as of November 2004, disposition of the involuntary bankruptcy had been delayed for over six months. At a hearing on October 26, 2004, the Court expressed its increasing concern over the delays and set the Holdings case for a hearing on December 13, 2004 to decide two issues: (1) whether the Holdings Petitioning Creditors were eligible to file the involuntary

petition and (2) whether Holdings was paying its debts as they came due.

**The Waltzer Claim**

In 1996 Waltzer apparently provided $250,000 in funding to Amanat in connection with the formation of the MarketXT Companies' predecessor, Tradescape. In exchange for his contribution, Waltzer received a 7–1/2% ownership interest. Waltzer has alleged that in 1998, Amanat and Holdings represented that the business was in decline and offered to purchase Waltzer's interest in the company. Waltzer then sold his interest back to Amanat and to Holdings for very substantial sums; Waltzer alleges, however, that Amanat and Holdings misrepresented their financial situation, allegedly as evidenced by the fact that in 2002, the MarketXT Companies received significant value in new trades and shortly thereafter were sold to E*Trade for substantial sums.

In January of 2003, Waltzer filed suit against Amanat and Holdings (then named Tradescape) in the New York Supreme Court, alleging, *inter alia,* that the defendants had fraudulently induced him to sell his interest in the MarketXT Companies. On December 19, 2003, on the basis of a series of defaults by Amanat and Holdings in responding to discovery demands and complying with court orders, the Supreme Court entered an order striking the defendants' answer. Also on that date, the Supreme Court granted Waltzer an order of attachment based on allegations that the defendants were attempting to move assets out of the reach of creditors.[2] Waltzer was able to have the Sheriff levy on one piece of property that appeared to

---

**2.** In connection with the order of attachment, Waltzer also deposed Amanat, who claimed that he had a limited income, approximately $20,000 per year, and that he had no assets to satisfy a judgment. Waltzer, however, claims to have located various bank accounts and holdings that Amanat allegedly attempted to

conceal. Waltzer also asserts that Amanat has sustained a lavish lifestyle, which demonstrates anything but a modest income. Moreover, Waltzer claims that Amanat indirectly funded settlements with several of the petitioning creditors in Holdings' involuntary bankruptcy case.

belong to Amanat, a house located at 5181 74th Street, Flushing, N.Y. (the "Queens Property"), but found that Amanat claimed to have already sold it to his brother prior to the service of the attachment. It is not clear on this record whether the order of attachment was effective in reaching any other property of Amanat, notwithstanding certain other properties being listed in the order of attachment.

In March 2004, the New York Supreme Court held an inquest on the measure of damages, at which Amanat was represented. In a written opinion, a special referee awarded Waltzer $4.38 million exclusive of pre-judgment interest and costs against Amanat and Holdings. On October 5, 2004, Waltzer docketed the judgment, then worth $6.5 million, inclusive of all costs and interest. Waltzer was in the process of beginning to enforce his judgment when this involuntary Chapter 7 petition was filed against Amanat.

**The Sanderson Claims**

In 1999, Michael O. Sanderson was employed as Holdings' CEO. In May of 2001, Holdings agreed to pay him a $159,750 bonus in six installment payments, ending in November of 2001. In July of 2001, Sanderson and Amanat entered into a "Separation and Release Agreement" whereby Sanderson relinquished his position as CEO; Holdings and Amanat agreed to make all outstanding salary and bonus payments due to Sanderson and Amanat assumed personal liability for the outstanding payments. In August of 2002, Sanderson commenced an NASD arbitration against Amanat and Holdings claiming that he had not received the amounts owing to him under the Separation and Release Agreement. Amanat and Holdings appeared at the first arbitration hearing to request an extension of time to answer so as to facilitate settlement negotiations with Sanderson. When these negotiations were

unsuccessful, the case was calendared by the NASD arbitration panel. On the eve of the final pre-hearing conference, Amanat's and Holdings' attorney announced his withdrawal. The NASD panel, however, held a final pre-trial hearing without Amanat and Holdings, issued a scheduling order and mailed it to Amanat and Holdings at their last known address. The matter proceeded to arbitration on October 14, 2003. Amanat and Holdings did not appear. On November 4, 2003 the arbitral panel issued an award in favor of Sanderson and against Holdings and Amanat. Sanderson thereafter brought a proceeding in New York Supreme Court to enforce the arbitration award. Amanat and Holdings contested the NASD panel's findings, claiming both that they had received insufficient notice and that the NASD panel misapplied the law. On March 30, 2004, the State court issued a judgment in favor of Sanderson for $159,965 (the award against Holdings was vacated on grounds not relevant to this involuntary case). That judgment remains unsatisfied.

**The Involuntary Petition**

On November 9, 2004, Jeffry Malonda, Amanat's part-time chauffeur, acting *pro se*, filed an involuntary Chapter 7 petition against Amanat. In the petition, Malonda asserts that he is owed $15,000 as a "Contractual Debt [for] services rendered." (Pet. dated November 9, 2004.) Malonda noted on the petition that his case was related to the Holdings involuntary Chapter 11 and correctly filled in the Holdings case name, number, and filing date. At trial, Malonda attributed the accuracy and depth of the information in his petition to a "friend" who is an attorney and who helped Malonda fill out the petition at his office; however, Malonda could not remember the name of the "friend" or the location of the office where the petition was prepared. He also could not recall

the names of other friends who helped him along the way.

Waltzer's attorney learned of the petition on November 9, 2004, during a conversation with Amanat's attorneys in the State court matter. The conversation allegedly took place either shortly before or at almost the precise time as the involuntary petition was filed. On November 12, 2004, Waltzer joined the involuntary petition and shortly thereafter filed a motion seeking an interim trustee. After the motion for an interim trustee was scheduled for hearing, the petitioning creditors of Holdings filed a similar motion seeking an interim trustee in their case. Although Holdings initially resisted this motion, and (as stated above) trial of the Holdings involuntary petition was initially scheduled for December 13, 2004, on December 2, 2004, Holdings converted its case to a voluntary Chapter 11 case.

The Amanat involuntary proceeding then proceeded to trial on the question whether an interim trustee should be appointed. After one day of testimony, principally by Amanat and Malonda, Amanat consented to the appointment of an interim trustee. He did not, however, concede that the Petitioning Creditors had satisfied the requirements of 11 U.S.C. § 303 to sustain this case. On November 29, 2004, Amanat filed his answer to the involuntary petition and on December 14, 2004 the Court held a hearing on the § 303 issues decided herein. Amanat testified and, with the consent of the parties, the record of the hearing on the motion for an interim trustee was included as part of the present record.

**Discussion**

Section 303 of the Bankruptcy Code allows a creditor, or a group of creditors, holding an aggregate of $12,300 in unsecured claims, to commence a bankruptcy case against a person where the creditor holds a claim "that is not contingent as to liability or the subject of bona fide dispute," and where the putative debtor is "generally not paying [his] debts as such debts become due, unless such debts are the subject of a bona fide dispute." 11 U.S.C. § 303(b)(1), 303(h). Where the putative debtor has more than twelve unsecured creditors, three petitioning creditors are needed. 11 U.S.C. § 303(b)(1), 303(b)(2).

Amanat makes two arguments in opposition to the Involuntary Petition: first, that neither Malonda, Waltzer nor Sanderson have standing, as defined in § 303, to file an involuntary petition; and second, that Amanat is paying his undisputed debts as they come due.[3] The Court will consider each of these contentions.

**The Eligibility of the Petitioning Creditors under § 303**

**1. Malonda**

As stated above, Malonda's claim arises from a "note" given to him by the Debtor as evidence of a bonus for services rendered. The Debtor argues that Malonda does not qualify as a creditor under § 303 because "the language of [the] guarantee is conditional and 'contingent as to liability' within the meaning of 11 U.S.C. § 303(b)(1)." (Amanat's Br. at 4.)

There are many outstanding questions relating to the Malonda petition. On the stand, Malonda could not explain what an

---

**3.** Amanat further argues that should the Court find that fewer than three petitioning creditors have standing to file an involuntary petition, he has more than 12 potentially eligible creditors and thus an involuntary petition against him would require at lest three petitioners. In view of the findings below, it is not necessary to determine the precise number of creditors.

"affiliate" is, yet he claims to have filled out the involuntary petition (with the help of a lawyer "friend" whose name he could not recall) and designated it as related to the Holdings' involuntary case (whose title and case number he claims to have seen lying around Amanat's car on one of the trips he chauffeured). Waltzer argued in connection with the motion for an involuntary trustee that Amanat colluded with his chauffer to file an involuntary personal case against himself because Waltzer was about to enforce his judgment against Amanat personally and Amanat had seen, from the Holdings experience, that the pendency of an involuntary case could stay enforcement of a judgment while leaving the putative debtor in control of his funds.

■ On the question now before the Court there is no need to decide whether there was collusion between Amanat and Malonda in Malonda's initial petition. No party has argued that the petition should be dismissed on such grounds, and under present circumstances, if Amanat colluded with Malonda to file the petition, Amanat would be estopped from denying Malonda's capacity. *Momentum Manufacturing Corp. v. Employee Creditors Committee (In re Momentum Manufacturing, Corp.)*, 25 F.3d 1132 (2d Cir.1994). Although no authority has been cited that a putative debtor's collusion in his own involuntary petition is, alone, enough to sustain a petition, it should be enough to estop the debtor from denying the eligibility of a creditor to file such a petition.

■ There is not, in any event, any real dispute that there is a debt. Malonda testified to the debt and produced a written commitment by Amanat to pay him $15,000 as soon as practical, but no later than March 15, 2004. (Pet. Ex. 5, Amanat Letter dated December 15, 2003.) Amanat also testified at the trial, unequivocally:

Q. Do you owe him $15,000?

A: I do.

Q: And you owed him $15,000 as of December 15, 2003?

A: I said I would pay it to him as soon as practicable.

(Tr. December 10, 2004 Hearing at p. 121, lines 9–14.) Amanat also listed Malonda as one of his creditors on the schedules he filed pursuant to Bankruptcy Rule 1003(b). The Court finds on the strength of the foregoing testimony that, at the time the petition was filed, Malonda was owed $15,000 by Amanat.

Amanat finds conditionality and contingency in the note that he gave to Malonda, stating that he would pay the debt "as soon as practical and hopefully no later than March 15th 2004." (Pet. Ex. 5, Amanat Letter dated December 15, 2003.) There is no contingency to Amanat's obligation to pay. Moreover, if it were relevant, there is ample evidence of an availability of funds to Amanat to make a $15,000 payment. Under New York law, a promise to pay after a date certain can be enforced by the obligee after that date. See N.Y. Gen. Oblig. Law § 5–1105 (McKinney 2001). A debtor cannot prevent a creditor from filing an involuntary case against him by claiming that payment of the debt is impractical. Malonda's debt was sufficiently fixed and due for him to act as a petitioning creditor.

### 2. Waltzer

Waltzer's claim arises from a lawsuit against both Amanat and Holdings, in which he was awarded a judgment of over $6 million. Amanat argues that Waltzer's claims are subject to a bona fide dispute and that, in any event, Waltzer is a fully secured creditor and therefore does not qualify as a petitioning creditor under § 303. The Court will deal with each argument in turn.

**(i) Bona Fide Dispute**

■ Amanat argues that Waltzer's claim is subject to a bona fide dispute because Waltzer holds, in effect, a default judgment, resulting from the actions of the New York Supreme Court in striking Amanat's answer because of the defendant's failures to provide discovery and to comply with court orders, and because Amanat has filed an appeal in the New York State court from the order striking his answer.

■ Bankruptcy Courts are required to follow a State's rules in determining the enforceability and effect of judgments from the State court. See *Kelleran v. Andrijevic*, 825 F.2d 692, 694 (2d Cir. 1987), *cert. denied*, 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988) (reversing bankruptcy court ruling that disallowed a proof of claim based on a default judgment because default judgment is enforceable in New York); *Zois v. Cooper*, 268 B.R. 890, 893 (S.D.N.Y.2001). Under New York law, a "defendant whose answer is stricken as a result of a default admits all traversable allegations in the complaint, including the basic allegation of liability . . . ." *Rokina Optical Co. v. Camera King, Inc.*, 63 N.Y.2d 728, 730, 469 N.E.2d 518, 519–20, 480 N.Y.S.2d 197, 198–99 (1984). After an inquest, New York law permits a party to enforce unstayed default judgments. See N.Y. CPLR 3215. Here, the State Court entered an order on liability and a judgment after an inquest on damages (at which Amanat was represented). Thus, pursuant to New York law, Waltzer's judgment is valid and enforceable.

This Court considered the effect in an involuntary case of an unstayed but disputed State judgment in *In re Drexler*, 56 B.R. 960 (Bankr.S.D.N.Y.1986), decided prior to *Kelleran*. In *Drexler*, two creditors filed an involuntary petition against a former insurance agent in connection with his failure to remit insurance premiums. One creditor had obtained a judgment after a trial, the second creditor had obtained a judgment when the State court struck the debtor's answer and entered judgment for the creditor. The debtor had filed a notice of appeal in each of the cases. The Bankruptcy Court noted that in New York, an unstayed judgment is fully enforceable and entitled to full faith and credit unless and until reversed on appeal. The Court held that it "would be contrary to the basic principles respecting, and would effect a radical alteration of, the long-standing enforceability of unstayed final judgments" for the Bankruptcy Court to find that such a judgment was, until reversed, subject to a bona fide dispute. *Id.* at 967. The Court concluded that a "claim based on an unstayed judgment as to which an appeal has been taken by the debtor is not the subject of a bona fide dispute." *Id.*

Amanat points to *Schlossberg v. Byrd (In re Byrd)*, 357 F.3d 433 (4th Cir.2004), where the Fourth Circuit refused to apply a *per se* rule respecting unstayed State court judgments that have been appealed in the context of a contested § 303 petition. The Court noted that "the Code does not make the existence of a bona fide dispute depend on whether a claim has been reduced to judgment," *Id.* at 438, and it expressly disavowed the *per se* rule in *Drexler*. But the Circuit Court in *Byrd* also held that a State court judgment "go[es] a long way toward establishing the absence of a bona fide dispute. Indeed it will be the unusual case in which a bona fide dispute exists in the face of claims reduced to a state court judgment." *Id.* And it stated that the "mere fact that a judgment is pending appeal does not mean that a bona fide dispute exists . . . ." *Id.* at 439. Moreover, the Circuit Court put the burden of establishing the existence of a

bona fide dispute on the putative debtor and required evidence beyond the testimony of the appellant in the State action to establish the existence of such a dispute. *Byrd,* 357 F.3d at 439–40.

In light of *Kelleran,* and the respect to be afforded State default judgments under Second Circuit law, there is support for a *per se* rule in this Circuit. However, even under the *Byrd* rationale, establishing what Amanat calls an "objective standard," Amanat has failed to overcome the presumption of validity of the Waltzer judgment. The only evidence offered was Amanat's own testimony that he believed he has a bona fide defense to the debt and the fact that he has filed a notice of appeal. He provided no further evidence and his appeal, which was filed on January 6, 2004, has not even been perfected. On this record, under *Byrd,* the Court would give effect to the State court judgment on an objective standard.

### (ii) Waltzer's Security

The Debtor next argues that Waltzer is ineligible to be a petitioning creditor because he is secured by the virtue of orders of attachment placed against the Debtor's properties in the State court action. Waltzer argues that he is unable to fully satisfy his claim and therefore is only a partially secured creditor.

■ Section 303(c) allows "a creditor holding an unsecured claim" to join in an involuntary petition. · The Second Circuit recently noted that the Bankruptcy Code "plainly requires that joining creditors hold unsecured claims." *Key Mechanical v. BDC 56 LLC (In re BDC 56 LLC),* 330 F.3d 111, 122 (2d Cir.2003). However, it is patently clear on this record that Waltzer's claim is mostly, if not entirely, unsecured. Under § 503(a) of the Bankruptcy Code, a creditor has "a secured claim to the extent of the value of such creditor's interest in

the estate's interest in such property" and "an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." For the purposes of § 303, "the determination of whether a claim is secured or not is based on what [the creditor] could recover through state proceedings." *In re Tsunis,* 39 B.R. 977, 979 (E.D.N.Y.1983). If the creditor's claims "can be satisfied in state court then the creditors would not be permitted to bring a petition for involuntary bankruptcy. If the claims cannot be satisfied in a state action, then the creditors remain unsecured and are entitled to bring an action in bankruptcy court." *Id.* As a leading treatise concludes, with regard to "a partially secured creditor, the amount of its claim for purposes of being a petitioning creditor is the amount of the unsecured portion of its debt . . . ." 2 L. King, et al., *Collier on Bankruptcy,* ¶ 303.03 (15th ed.1979).

■ In the case at bar, Waltzer holds a $6 million judgment. Pursuant to that judgment he apparently attempted to attach a house in Queens worth about $150,000 that Amanat owned but claims to have sold to his brother before the attachment. Waltzer may also claim to have security in Amanat's expectancy interest in a condominium, which is subject to a mortgage and owned by Amanat only as a tenant by the entirety with his wife. Amanat's interest is worth at most $1.1 million, the amount of equity available, without even considering the interest of Amanat's wife. The value of the property subject to Waltzer's attachment, therefore, falls far short of the $6 million judgment. Waltzer holds an unsecured claim, and he is eligible to join the involuntary petition.

### 3. Sanderson

■ Amanat also argues that Sanderson is not properly considered a creditor under

§ 303(b) because of two flaws in Sanderson's arbitration award: first, that Amanat never received proper notice of the arbitration hearing; and second, that the arbitration panel ignored New York law in finding him personally liable for the debt.[4]

The procedural history of the Sanderson judgment is not in dispute. Amanat answered Sanderson's NASD arbitration demand but later defaulted. The NASD award was later reduced to judgment, over the objections of Amanat. In those proceedings Amanat raised the same issues he has raised here and argued both the due process issues and that the arbitrators misapplied the relevant law in holding him personally liable. The State court opinion enforcing the arbitration award decided both issues. It first found, as to the reasonableness of notice, that the record was "not sufficient to explain Mr. Amanat's default," and second, as to Amanat's argument on the merits, that "there is absolutely no indication in the motion papers submitted to this Court that [Amanat] or his counsel ever objected to the petitioner's efforts to hold him personally liable. A court is hard pressed to infer that [arbitrators] consciously disregarded [the law] . . . ." (Pet. Ex. 16 at 5–6) (quotations omitted). Moreover, unsubstantiated and vague claims of lack of notice of subsequent hearings do not suffice to raise an issue of due process and prevent entry of a judgment enforcing an NASD award. Cf. *Gibbons v. Smith*, No. 01 Civ. 1224 (S.D.N.Y. March 22, 2002), *aff'd*, 67 Fed. Appx. 52 (2d Cir.2003) (unpublished).

▮ Under these circumstances, the same principles applied above with respect to the Waltzer judgment establish the Sanderson judgment as a debt not presently subject to bona fide dispute within the meaning of § 303(b). It is a funda-mental principle that federal courts cannot re-examine the judgments of State courts. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Col. Ct. of App. v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). As discussed above, a bankruptcy court cannot ignore a State court judgment based on Amanat's vague and unsubstantiated assertions. Indeed, Amanat did not even file an appeal from the State court judgment. For the purposes of § 303, the State court judgment is valid and not subject to a *bona fide* dispute.

## Amanat Is Generally Not Paying His Debts As They Come Due

▮ Section 303(h) further provides for entry of an order for relief only when a debtor is "generally not paying such debtor's debts as they become due unless such debts are subject to a bona fide dispute." In order to make a factual determination on this issue, courts generally "look at the number of claims that the debtor has not paid, the amounts of these unpaid claims, the materiality of the non-payments, and the debtor's overall financial condition and affairs." *In re Paper I Partners, L.P.*, 283 B.R. 661, 677 (Bankr. S.D.N.Y.2002). In *Crown Heights Jewish Community Council v. Fischer (In re Fischer)*, 202 B.R. 341 (E.D.N.Y.1996), two creditors, one holding a $2 million dollar claim, one holding a $275 claim, filed an involuntary petition. The court held that "an order for relief may be granted where such debt or debts are sufficiently substantial to establish the generality of the alleged debtor's default." *Id.* at 350–51. Where a debtor fails to pay even one debt that makes up a substantial portion of its overall liability, a court may find that he is

---

4. Amanat testified that he "never received notice of the final arguments when the NASD arbitration was supposed to be heard . . . ." (Tr. Of Dec. 14, 2004 at p. 21, ln. 8–10.)

generally not paying his debts. See *In re Concrete Pumping Service*, 943 F.2d 627 (6th Cir.1991) (holding that a debtor in default of 100% of its obligations to one creditor is not paying its debts as they become due); *In re Garland Coal & Mining Co.*, 67 B.R. 514, 521 (Bankr.W.D.Ark. 1986) (holding that a debtor who paid less than 50% of his total debt is generally not paying his debts as they come due).[5]

In the case at bar, Amanat first argues that Waltzer's and Sanderson's debts should not be counted for the purposes of § 303(h) because they are the subject of a bona fide dispute. As stated in *Colliers*, however, "the courts have treated the determination of a bona fide dispute under section 303(h) in the same manner as they made the determination under section 303(b)." 3 King, et al. *Collier on Bankruptcy* at 303.14 (15th Ed.2004). For the reasons set forth above, Waltzer's and Sanderson's debts are not subject to bona fide dispute for § 303 purposes and will be counted in considering Amanat's overall liability.

■■■ Amanat then lists 24 debts in Exhibit B to his post-trial memorandum that he claims he is paying. Although these are in number a significant majority of the debts he owed at the time of trial, these debts are, in part, small, and most of them are payable by Amanat's companies or by his wife.[6] The legal bills in particular have either been paid by Amanat's companies in the past or have been deferred under a payment plan with the lawyers' consent. In his testimony Amanat could not specify one debt he had ever paid, and he did not provide a single check the he had signed, and it appears that all of his debts have

been paid in the past either by one of his companies or by his wife.

The courts have held that debts customarily paid by others should not be considered on the issue whether a debtor is generally paying his debts as they become due. *In re The Food Gallery At Valleybrook*, 222 B.R. 480, 488–89 (Bankr. W.D.Penn.1998) (collecting cases). But even were all of the debts Amanat has listed in his schedule considered, the aggregate sum that Amanat owes to Sanderson, Malonda and Waltzer is more than 65% in amount of his total debt, including his $2.8 million mortgage, and over 87% of Amanat's unsecured debt. This case, thus, concerns a debtor who is paying less than half of his total debts and who has not paid anything to Malonda, Waltzer, or Sanderson. See *Concrete Pumping Service*, 943 F.2d 627; *In re Garland Coal and Mining*, 67 B.R. at 514. On these facts, the Court finds that Amanat is generally not paying his debts as they become due.

### Conclusion

In his answer, Amanat also asks that the Court dismiss all proceedings in the case under § 305(a)(a) of the Bankruptcy Code on the ground that the interests of the putative debtor and creditors would be better served by dismissal. The Court is aware that an individual who has in the past had success in business is being petitioned into bankruptcy by two creditors whose debts he hotly disputes and by another creditor whose actions in filing the petition are suspect. However, for the reasons stated above, the statutory requirements for an involuntary petition have been met. Beyond that, there is no doubt that a bankruptcy case would be in the interests of creditors and would likely

---

5. In *Concrete Pumping*, the Circuit Court found relevant the fact that the principal of the debtor had apparently engaged in questionable transactions.

6. They include three doctor's bills, bills from a utility company, credit card debts, a magazine subscription, auto insurance payments, and lawyer's bills.

be in Amanat's best interest as well, allowing him to marshal his assets fairly and deal as best he can with the claims against him.[7] Amanat's failure to deal responsibly with his financial reverses is patent on this record, and with respect to the *Holdings* case, after months of delay, Amanat's principal holding company was finally put into bankruptcy. Clearly some order must be imposed on Amanat's complex and far-flung financial interests. There are undoubtedly actions by a putative debtor that justify dismissal of a bankruptcy case. See *In re Briarpatch Film Corp.*, 281 B.R. 820 (Bankr.S.D.N.Y.2002). In this case, no legitimate interest would be served by dismissing the petition.

 There is one caveat, however. No party has had a fair opportunity to consider whether this debtor should be in Chapter 7 or Chapter 11. Under § 706 of the Bankruptcy Code, even an involuntary debtor has an absolute right to convert a case under Chapter 7 to a case under Chapter 11. *In re J.B. Lovell Corp.*, 876 F.2d 96 (11th Cir.1989); see H.R.Rep. No. 595, 95th Cong., 1st Sess. 380 (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6336. Under the circumstances, before entry of an order for relief and appointment of a trustee, Amanat and other parties in interest should have an opportunity to consider conversion to Chapter 11.

The Petitioning Creditors shall settle an order on three days' notice.

---

7. For example, there is no question that Amanat's appeal from the State judgment can go forward. See *In re Sletteland*, 260 B.R. 657 (Bankr.S.D.N.Y.2001). As for the doctor's bills and other household debts that he may owe with his wife and that she has customarily paid, nothing in the Bankruptcy Code precludes her from paying those debts as in the past. Nor should there be any impediment to Amanat pursuing his litigation claims; he will not lose any rights he may have as the holder of the "equity interest." Cf. *Central Ice Cream*, 836 F.2d 1068 (7th Cir.1987).