**In re Robert C. NARGASSANS, Debtor.**

**Bankruptcy No. 88B–12719 (HCB).**

United States Bankruptcy Court,
S.D. New York.

July 19, 1989.

---

**447**

Daniel A. Zimmerman, New York City, for Petitioning Creditors.

Robert Grant, New York City, for alleged debtor.

## DECISION

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

By motion for summary judgment, the Alleged Debtor, Robert C. Nargassans, seeks an order pursuant to Bankruptcy Rule 1011 dismissing the involuntary petition under Chapter 7 of the Bankruptcy Code filed against him pursuant to 11 U.S.C. § 303. He contends that the petitioners are not qualified to file the petition because their claims are the subject of a bona fide dispute and his liability, if any, is contingent. In addition, Nargassans requests the imposition of sanctions against petitioners American Guild of Variety Artists ("AGVA"), a labor union, and its Executive Vice President, Eileen M. Collins ("Collins"); Gerald Dunbar, General Counsel; and Daniel A. Zimmerman, Attorney for the petitioners, pursuant to 11 U.S.C. § 303(i)(2). The sanctions sought include actual damages for court costs, disbursements, attorneys fees in the amount of $5,000; and damages for mental distress and embarrassment in the amount of $250,-000.

The Petitioners are AGVA and twenty-seven individuals formerly employed by a closely held corporation known as Alcazar de Paris in New York, Inc. ("Alcazar"), a debtor in a companion Chapter 11 case. They have filed a cross-motion for summary judgment, insisting that their claims against Nargassans are neither contingent nor the subject of a bona fide dispute. Petitioners assert two claims agianst Nargassans: that he is personally liable for wages and payments due to the AGVA Welfare Trust Fund (the "AGVA Fund") by Alcazar (i) in contract and (ii) under N.Y.Bus.Corp.Law § 630 (McKinney 1986) ("BCL § 630"). By cross-motion Petitioners also seek summary judgment on the ground that their claims are not subject to bona fide dispute or are contingent and that Nargassans is not paying his debts when due.[1]

As structured by the parties, the questions are whether there is a bona fide dispute as to Nargassans having personally obligated himself to pay the debts arising under the contracts he signed with AGVA and the Petitioners and whether Nargassans' liability under BCL § 630 is contingent. The question of whether Nargassans is paying his debts when due raises the same issues. He has not paid the 28 petitioners because he claims their debts are disputed or contingent.

### I

The facts material to this motion are largely undisputed. Nargassans, a resident of Dover, Massachusetts, is the president and sole stockholder of Alcazar, a domestic corporation duly incorporated in April, 1988. Alcazar maintains an office in

1. § 303(b)(1) and (h)(1) provide, in pertinent part:

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute, or an indenture trustee representing such a holder, if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

(h) If the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition is filed. Otherwise, after trial, the court shall order relief against the debtor in an involuntary case under which the petition was filed, only if—

(1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute.

care of its former attorney who also represents Nargassans.

On May 16, 1988, Alcazar signed a lease for the Apollo Theater at 234 West 42nd Street, New York, New York 10036. It then began remodeling the premises in order to accommodate its plans to produce a "Restaurant Theater." In July 1988, Nargassans, Steven Yuhasz, Alcazar's Creative Producer, and Dick Scott ("Scott"), an agent for the show's choreographer met with Jerry Kall ("Kall"), a representative of AGVA. Scott introduced Nargassans to Kall as the President of Alcazar. Yuhasz Aff. at ¶ 5. Kall brought a proposed Producer/Employer—AGVA Agreement (the "Form Contract") to the theater the following week and was told that the correct name of the Producer/Employer was Alcazar de Paris in New York, Inc. *Id.* at ¶ 6.

Nargassans and Yuhasz subsequently met with Deidre Kane ("Kane"), National Director of AGVA, and Collins, AGVA's Executive Vice–President. Collins was similarly told that the Producer/Employer was Alcazar de Paris in New York, Inc. to which she replied "That's fine." *Id.* at ¶ 8. At this meeting, the proposed Form Contract and the Union Rule Book were discussed. Modifications to the Form Contract and "some of the rules were incorporated into the Agreement." *Id.* at ¶ 7. These negotiations were set forth in a Letter Agreement, Alleged Debtor's Exh. 1, that was prepared by Yuhasz and signed by Nargassans on September 14, 1988 and by Collins on September 16, 1988. Although the printed Form Contract is dated September 18, 1988, it was apparently not signed until some time in November. Yuhasz Aff. at ¶ 13. Nargassans concedes that the Letter Agreement together with the Form Contract were to constitute the total agreement. Alleged Debtor's Supplemental Brief at 7.

The Letter Agreement states that the "name of the *corporation* is Alcazar de Paris in New York, Inc." (emphasis added). The typed language below the signature block Nargassans signed reads:

"Agreed and Accepted/Alcazar de Paris in New York, Inc/Robert Nargassans/Producer."

The Form Agreement reads, in pertinent part: Robert Nargassans (Associate(s) Name(s)) and Alcazar De Paris in New York, Inc. (Corporation Name) (hereinafter called the Producer/Employer), its successors and assigns. The Form Agreement is signed only by Nargassans on the line for "Full name of Producer/Employer". The signature line for a signature of an Alcazar officer is blank. The individual Artists Engagement Contracts ("AEC's") are pre-printed AGVA form contracts filled in by Yuhasz and signed by Nargassans and the artists on or about September 19, 1988. These contracts list the Operator and/or Producer as Alcazar. Nargassans' name had first been typed into that space but was deleted. The typed language of the signature block of these contracts, however, places both Alcazar and Robert C. Nargassans on the line for Operator and/or Producer. Nargassans' signature appears on the following line under which is printed: "Signature of Officer of corporation, partner or owner and Title." No title is indicated. Alleged Debtor's Exh. 4.

The record does not state when the show actually opened but the AECs specified the "contemplated date of first public performance" as October 21, 1988. Alleged Debtor's Exh. 4. On November 26, five employees were laid off. When Nargassans refused to pay severance benefits demanded by AGVA, the union struck the show on December 2 and forced it to close. The reason given was that the security bond required by the Form Contract had not been posted. Nargassans Aff. at ¶ 11. The Yuhasz affidavit elaborates further: "We met with them at about 8:00 PM and were told that the bond had to be posted and the full amount due the Welfare Fund had to be paid immediately. Mr. Nargassans stated he could not do so immediately." Yuasz Aff. at ¶ 15. The show was closed that night. *Id.* at ¶ 17.

The present action was commenced by the filing of an involuntary petition on behalf of AGVA and AGVA members and

Richard Lavsky, a contractor of Alcazar, under Chapter 7 against Nargassans on December 20, 1988.[2] The petitioners claim that Nargassans is indebted to the AGVA Fund for the balance of contributions due since October 17, 1988, Kane Aff. Exh. D, a sum exceeding $5,000, Petitioning Creditor's Summary Judgment Memo at 5; and is indebted to each of the individual employee petitioning creditors for "some sum of money" for wages. *Ibid.*

## II

As relevant here § 303(b) provides that an involuntary bankruptcy case may be filed by at least three entities, each of which is either a holder of a claim against such person "that is not contingent as to liability or the subject of a bona fide dispute" if those claims aggregate at least $5,000. Nargassans does not dispute the amount of the claims or the number of petitioners. He contends that the petitioners have no standing because their claims are the subject of a bona fide dispute or are contingent and thus precluded by § 303(b)(1).

### A.

#### Bona Fide Dispute

Prior to the adoption by Congress of the Bankruptcy Amendments and Federal Judgeship Act of 1984, a claim asserted by a petitioner need only have been non-contingent. Even so, in 1983 the Second Circuit stated: "Still we have difficulty in believing that Congress intended that a debtor should be found to be generally not paying its debts as they become due under § 303(h)(1) or that a claim qualifies under § 303(b), when the claim is subject to serious dispute." *In re B.D. Int'l Discount Corp.*, 701 F.2d 1071, 1076 (2d Cir.), *cert. denied*, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983); *accord In re Wallace Dill*, 731 F.2d 629 (9th Cir.1984). Congress agreed by amending § 303 in July of 1984 to add the phrase "the subject of a bona fide dispute" to both § 303(b)(1) and (h)(1).

That phrase is defined in neither the legislative history nor the Code. *In re Drexler*, 56 B.R. 960, 965–66, Bankr.L. Rep. (CCH) ¶ 70992 (Bankr.S.D.N.Y.1986) The simplicity of the language is deceptive. *Id.* 56 B.R. at 966. In *In re Ross*, 63 B.R. 951, 960 (Bankr.S.D.N.Y.1986) this Court defined the term as an "honest conflict" or "good faith controversy." *Accord, In re Tikijian*, 76 B.R. 304, 315, 16 Bankr.Ct. Dec. (CRR) 221, 229 (Bankr.S.D.N.Y.1987). Although this language suggests an inquiry into the subjective intent of the debtor, *Ross*, 63 B.R. at 960, the test is objective. *Matter of Busick*, 831 F.2d 745, 750 (7th Cir.1987). ("Under this standard, the bankruptcy court must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of a debt."); *see also B.D. Int'l*, 701 F.2d at 1077; *Tikijian*, 76 B.R. at 314. Conversely, a subjective standard places the court in the unenviable position of judging a debtor's motives, leaving in the end an undefinable standard.

■ Consistent with an objective standard, one court has suggested that if the alleged debtor's defense raises material issues of fact such that "summary judgment could not be rendered as a matter of law in favor of the creditor on a trial of the claim, the claim is subject to a bona fide dispute." *In re Stroop*, 51 B.R. 210, 212, 13 Bankr. Ct.Dec. (CRR) 319 (D.Colo.1985). In this Circuit, the objective test is not so strict. Rather, as Judge Friendly ruled in *B.D. International*, "In order to qualify a claim as a basis for seeking involuntary bankruptcy, a claimant need not make out a case warranting summary judgment ... It is sufficient to establish ... that there are good grounds for the claim and that no defenses have been asserted in substantiable form." 701 F.2d at 1077. As cast in different form in *In re Johnston Hawks, Ltd.*, 49 B.R. 823, 830, 13 Bankr.Ct.Dec. (CRR) 122, 127, 12 Collier Bankr.Cas.2d (MB) 1188, 1197 (Bankr.D.Ha.1985), "[a]

---

**2.** The claim of petitioner Richard Lavsky, a subcontractor of Alcazar, was subsequently withdrawn.

bona fide dispute is a conflict in which an assertion of a claim or right made in good faith and without fraud or deceit on one side is met by contrary claims or allegations made in good faith and without fraud or deceit on the other side."

Such a standard accords with the little legislative history there is. In proposing the 1984 amendment to § 303(b), Senator Baccus explained that the intention was to preclude involuntary petitions based on claims that the alleged debtor has not paid due to "a legitimate and good faith dispute over his or her liability." S. 7618, 98th Cong.2d Sess., June 19, 1984. The concept of a legitimate dispute connotes an objective standard. The addition of "good faith" can be seen to relate to the due inquiry standards of Rule 11 of the Federal Rules of Civil Procedure and Bankruptcy Rule 9011.

■ In the application of the standard, it is clear that a bona fide dispute exists as to Nargassans' contractual liability to AGVA and the artists. On their faces, the AECs are ambiguous. The deletion of Nargassans' name from the body of the contracts indicates that he was not a party to those agreements. Conversely, plaintiffs assert, his failure to append a title to his signature reflects individual liability. This controversy alone amounts to a bona fide dispute. Petitioners claim that this ambiguity is resolved by the clauses of the Form Contract and AECs providing that in the event of any inconsistency or conflict in the writings, the Form Contract shall govern. *See* Petitioning Creditors' Summary Judgment Memorandum at 13–14. That assertion is without merit. The inconsistency or conflict to be governed by the Form Contract is in the terms described in the body of the contracts, not the manner in which they were signed.

The Form Contract is also ambiguous in this respect. At one point it refers to Nargassans as associate and Alcazar as producer/employer. The signature line, however, refers to Nargassans as producer and the line for Alcazar is not completed. It would appear that little, if any, attention was paid to the correct line for signature.

As noted above, the Letter Agreement does not clarify this problem. There is thus a bona fide dispute as to whether Nargassans agreed to be personally liable to Petitioners.

In addition, since the AECs were signed "By" Nargassans on the line for the signature of an officer of the corporation, partner or owner and title although he did not affix a title to his signature, the different ways in which he signed all these documents is enough to raise a bona fide dispute. It is highly unlikely that Nargassans signed the AECs and the Form Contract in different capacities.

Moreover, "where one party to a written contract is known to the other to be in fact acting as agent for some known principal he does not become personally liable whether he signs individually or as agent." 3 N.Y.Jur.2d *Agency* § 276 (1980) (footnote omitted). As it is unclear from the four corners of the agreements whether Nargassans was acting as agent for a disclosed principal, that can only be revealed from the meetings and letters between the parties. "Where the contract is ambiguous on its face as to whether it is the individual contract of the agent or a contract made for his principal although signed by the agent individually, parol evidence is admissible to show the intention of the parties." *Ibid.*

From the parties' affidavits and letters, it appears that there is at least a legitimate controversy on this score as well. Nargassans states that he advised AGVA representatives that he was the President of Alcazar and that the correct name of the employer was Alcazar. Here, the terms of the parol evidence rule do not bar the extrinsic evidence offered by the parties on the issue of Nargassans' contractual liability. Where parties have reduced an agreement to writing, they may not offer evidence of prior or contemporaneous agreements that will vary the terms of the agreement if the writing is unambiguous. *Wallace Steel, Inc. v. Ingersoll–Rand Co.,* 739 F.2d 112, 115 (2d Cir.1984); 2 *Restatement (Second) of Contracts* Section 213, at 129 (1979). But since the agreements do

not make clear whether Nargassans signed them individually or as an officer or agent, the evidence is admissible. *See generally In re Kam Kuo Seafood Corp.*, 76 B.R. 297, 301–02 (Bankr.S.D.N.Y.1987). The presence of that bona fide dispute requires that summary judgment be granted to Nargassans on the disputed nature of Petitioner's contractual claims. *Id. See also Boston Beverage Corp. v. Turner*, 81 B.R. 738 (D.Mass.1987); *In re Braten*, 86 B.R. 340 (Bankr.S.D.N.Y.1988); *Matter of Busick*, 65 B.R. 630, 16 Collier Bankr.Cas.2d (MB) 1529 (D.Ind.1986), *aff'd* 831 F.2d 745 (7th Cir.1987).

## B.

### Contingent Claims

■ Having determined that Petitioners' contractual claims are subject to bona fide dispute and therfore ineligible under § 303(b), we turn to their claims that Nargassans is directly liable for the wages due the individual artists and the portion due AGVA as check off dues and contributions to its pension fund.

In New York, the ten largest shareholders of a privately held corporation are "personally liable for all debts, wages or salaries due and owing to any of its laborers, servants or employees other than contractors, for services performed by them for such corporation." BCL 630(a). The statute circumscribes such liability by notice and timeliness provisions. It states:

> Before such laborer, servant or employee shall charge such shareholder for such services, he shall give notice in writing to such shareholder that he intends to hold him liable under this section. Such notice shall be given within one hundred and eighty days after termination of such services, except that if, within such period, the laborer, servant or employee demands an examination of the record of shareholders under paragraph (b) of section 624 (Books and records; right of inspection, prima facie evidence), such notice may be given within sixty days after he has been given the opportunity to examine the record of shareholders.

> An action to enforce such liability shall be commenced within ninety days after the return of an execution unsatisfied against the corporation upon a judgment recovered against it for such services.

*Id.* (emphasis added).

Nargassans does not dispute that he is the sole stockholder of Alcazar nor that the artists and AGVA's claims, if deemed valid, are for wages within the meaning of 630(b) of the BCL. Rather, he asserts that the statute's application to him is contingent until it is determined in Alcazar's bankruptcy case whether these claims will be paid.

In order to have standing, the Petitioners' claims must be non-contingent. The accepted standard for determining contingency in this context was set forth in *In re All Media Properties, Inc.*, 5 B.R. 126, 133, 2 Collier Bankr.Cas.2d 449, 456 (Bankr.S.D. Tex.1980), *aff'd* 646 F.2d 193 (5th Cir.1981). The court held that

> claims are contingent as to liability if the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor and if such triggering event or occurrence was one reasonably contemplated by the debtor and creditor at the time the event giving rise to the claim occurred.

*Id. Accord, B.D. Int'l*, 701 F.2d 1071; *In re Covey*, 650 F.2d 877 (7th Cir.1981); *In re Drexler*, 56 B.R. at 966, n. 9; *In re Tampa Chain Co., Inc.*, 35 B.R. 568 (Bankr.S.D.N. Y.1983); 2 L. KING, K. KLEE, R. LEVIN, H. MILLER & P. MURPHY, Collier on Bankruptcy ¶ 303.08(11)(a) (15th ed. 1989). Thus, the question posed here is whether, in light of the last sentence of BCL § 630(a), the artists' wage claims are contingent. In this, the state courts give little guidance.

In *Grossman v. Sendor*, 89 Misc.2d 952, 392 N.Y.S.2d 997 (Sup.Ct.N.Y.Co.1977), *modified on other grounds* 64 A.D.2d 561, 407 N.Y.S.2d 22 (1st Dept.1978), a union sought to recover under BCL § 630(a) the unpaid balances owed by the defendant's company pursuant to a collective bargain-

ing agreement requiring it to make payments to the union's pension and welfare funds calculated on the basis of the employees' gross earnings. The company filed a reorganization petition in bankruptcy and apparently continued in business. The union's action was brought within 90 days after confirmation of the company's plan. The court held that the required contributions constituted "wages" under BCL § 630(a) and further held that the action was timely brought under the last sentence of the statute. The court reasoned:

> There remains the question of whether the action was timely commenced by the plaintiff. BCL 630(a) provides that an action against stockholders 'shall be commenced within ninety days after the return of an execution unsatisfied against the corporation upon a judgment recovered against it for such services.' This was interpreted in *Murphy v. Meyer*, 154 Misc. 341, 342, 277 N.Y.S. 86 (Sup.Ct. 1934) to mean that an action could also be commenced where the plaintiff had exhausted his remedies in bankruptcy and it was impossible to get an unsatisfied judgment against the corporation and thereby meet the condition precedent imposed by the statute. In this case, this became impossible only upon the confirmation order, for it was only then that the debt of the corporation was discharged. 11 U.S.C. § 771 ... and as long as it is theoretically possible to collect the debt from the corporation, the stockholders are not liable, for the purpose of the statute was to create an exception to the rule of limited liability only where employees could not collect their wages because of the insolvency of the corporation.

392 N.Y.S.2d at 1001. Pursuant to this dictum in *Grossman*, therefore, a claim under BCL § 630(a) would be contingent since it depended upon resolution of the corporate employer's bankruptcy.

A different approach was taken in *Sasso v. Millbrook Enterprises, Inc.*, 108 Misc.2d 562, 438 N.Y.S.2d 59 (Sup.Ct. Nassau Co. 1981) and *Sasso v. Gallucci*, 112 Misc.2d 865, 447 N.Y.S.2d 618 (Sup.Ct. Nassau Co. 1982). Those cases held that suits under BCL 630(a) need not await the conclusion of the bankruptcy proceeding of the debtor corporation. The *Sasso* courts reached that result by reasoning that the requirement of a returned unsatisfied execution contained in BCL § 630(a) becomes impossible by virtue of the automatic stay imposed by the Bankruptcy Code and is, therefore, to be excused. From those cases it is not clear if the employers filed liquidation petitions under Chapter 7, reorganization petitions under Chapter 11, or, if they filed under Chapter 11, whether they continued in business and were able to pay the union's claims.

None of these cases explicitly addresses the instance where the former employer is the subject of a Chapter 11 petition but has ceased to do business and may be liquidated. Nor, in our judgment, do they recognize the evident purposes sought to be achieved by BCL § 630 in considering its application when an employer enters bankruptcy.

It cannot be gainsaid that BLC § 630 was designed "to provide a safeguard for employees who would otherwise be left without recourse in the event of a corporation's insolvency." *Sasso v. Vachris*, 66 N.Y.2d 28, 31, 494 N.Y.S.2d 856, 484 N.E.2d 1359 (Ct.App.1985). (Holding that the Employee Retirement Income Security Act of 1974, § 514(a) did not preempt the enforcement mechanism of BCL § 630). That purpose, however, is tempered by the notion that the shareholders should not be liable until the inability of the corporate employer to pay wages is confirmed. The New York State Legislature clearly sought to achieve this balance in the last sentence of BCL § 630(a) by providing the safeguard of a returned unsatisfied execution directed to the company.

If *Grossman*, in accepting the suit filed after confirmation of a bankruptcy reorganization plan, is to be read as also precluding such a suit prior to confirmation, that reading, urged by Nargassans, disregards the purpose of protecting employees and fails to recognize that the length of time it often takes to resolve a Chapter 11 case

can significantly undermine that protection. *Sasso v. Millbrook* and *Sasso v. Gallucci* read the limited safeguard of shareholders out of the statute rather than trying to accommodate it. None of these cases is an appellate court case. Were the New York Court of Appeals to consider the issue, however, it would not shunt aside the balance but interpret the statute in light of its intended purposes. *E.g., Carr v. New York State Bd. of Elections*, 40 N.Y.2d 556, 388 N.Y.S.2d 87, 356 N.E.2d 713 (Ct. App.1976); *Patrolmen's Benevolent Ass'n of New York v. City of New York*, 41 N.Y.2d 205, 391 N.Y.S.2d 544, 359 N.E.2d 1338 (Ct.App.1976); *Bd. of Educ. of New York v. Shanker*, 23 N.Y.2d 111, 295 N.Y. S.2d 625, 242 N.E.2d 802 (Ct.App.1968). As explained below, that balance would require the state courts, in determining whether such a suit is premature, to examine the ability of the bankrupt employer to pay the employees' claims under BCL § 630(a).

It being given that the bankruptcy courts do not vacate the automatic stay of § 362(a) of the Bankruptcy Code to permit unsecured creditors to levy on estate property but rather distribute the proceeds through the bankruptcy process or permit debtors to reorganize under the constraints of the Bankruptcy Code, both purposes are accommodated by permiting suits under BCL § 630(a) to be brought against shareholders on proof that the corporate debtor would be unable to pay such claims in full. In some instances where a debtor has failed to pay wages and make employee benefit plan contributions only in the period shortly before filing a bankruptcy petition, those claims might enjoy the third and fourth priorities afforded by § 507(a)(3) and (4) of the Bankruptcy Code [3] and there

might be funds available to pay them. If the failure is of longer duration or larger than the $2,000 per employee limit set by those sections and the company is insolvent in the balance sheet sense, then the claims will not be fully paid in the bankruptcy proceeding and the New York courts, as in *Sasso v. Millbrook* and *Sasso v. Gallucci*, would likely permit suit under BCL § 630(a) to be brought, given the inability, in light of the automatic stay, to obtain an unsatisfied execution. The strong policy of protecting employees, unequivocally expressed by the New York Court of Appeals in *Sasso v. Vachris*, permits no other result. Thus interpreted, BCL § 630(a) satisfies both legislative purposes.

Nargassans, nevertheless, argues that such a determination makes the claims contingent. Although the eligibility of a claim brought under BCL § 630(a) is dependent on a further court determination of the employer's ability to pay, that determination of whether an action is timely brought is not itself the occurrence of an extrinsic triggering event conceptualized in the widely accepted *All Media* definition of contingent claims. In *All Media*, the court, in applying that definition under § 303(b), held that the presence of the defense that the debt is barred by a statute of limitations does not make a claim contingent as to liability, because the liability was fixed when the debt was incurred. 5 B.R. at 136, 140. In the words of the *All Media* definition, the incurring of liability was not dependent on the occurrence of an extrinsic event as distinguished from court resolution of the dispute.

Here, to the extent that Nargassans' liability is dependent on the return of a writ

---

**3.** § 507(a)(3) and (4) provide:

(3) Third, allowed unsecured claims for wages, salaries or commissions, including vacation, severance, and sick leave pay—

(A) earned by an individual within 90 days before the date of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B) to the extent of $2,000 for each such individual.

(4) Fourth, allowed unsecured claims for contributions to an employee benefit plan—

(A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B) for each such plan to the extent of

(i) the number of employees covered by each such plan multiplied by $2,000; less

(ii) the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

of execution against the employer-corporation, that contingency is transformed to a summary determination by a court of the employer-corporation's ability to pay BCL § 630(a) claims if it is in bankruptcy. Under *All Media*, the need for that determination does not make the claims contingent.

Nor can it be said that the need to make such a summary determination makes BCL § 630(a) claims the subject of a bona fide dispute. If the issue of the employer-corporation's ability to pay is truly contested, then the claim will be subject to a bona fide dispute and be ineligible. But where a Chapter 11 debtor is no longer in business and its estate is obviously insufficient to pay its employees' BCL § 630(a) claims, to force the employees to wait for the conclusion of the bankruptcy case only delays the inevitable and subverts the protection of the statute. In such an instance, creditors are hardly using "the Bankruptcy Code as a club against debtors who have bona fide questions about their liability ..." S. 7618, 98th Cong.2d Sess., June 19, 1984 (S. Baccus).

Moreover, although the courts in *In re Lough*, 57 B.R. 993, 997, 14 Bankr.Ct.Dec. (CRR) 114, 116, 14 Collier Bankr.Cas.2d (MB) 375, 380 (E.D.Mich.1986); *In re Robin Leach*, 92 B.R. 483, 487, 18 Bankr.Ct. Dec. 537, 540 (D.Kan.1988); *Boston Beverage Corp. v. Turner*, 81 B.R. at 744–45; *In re Braten*, 86 B.R. at 343–44; *In re B.B. S.I., Ltd.*, 81 B.R. 227, 230, 16 Bankr.Ct. Dec. (CRR) 1290, 1292–93, Bankr.L.Rep. (CCH) ¶ 72171 (Bankr.E.D.N.Y.1988); and *Matter of Busick*, 65 B.R. at 637, have said that the bona fide dispute test includes a meritiorous contention as to the application of law to undisputed facts concerning the validity of a claim, it remains nevertheless true that Congress has assigned to the bankruptcy courts the task of determining whether a claim is contingent. As here, that exercise often requires the examination and resolution of state law principles as opposed to whether the claim itself is cognizable in law. The presence of "substantial, non-frivolous arguments" concerning the law applicable to determine whether or not a liability was incurred, *Lough*, 57 B.R. at 998, is far different from interpreting a state statute imposing liability to determine, as we have done here, if that liability is contingent.

We thus hold that neither motion can be granted at this stage and that the parties are to submit further papers on the issue of Alcazar's ability to pay Petitioners' BCL § 630(a) claims as set forth in the accompanying order.