**In re ELSA DESIGNS, LTD.,**
**Alleged Debtor.**

**Bankruptcy No. 92 B 41833 (TLB).**

United States Bankruptcy Court,
S.D. New York.

June 1, 1993.

As Corrected June 25, 1993.

Citak & Citak by Donald L. Citak, New York City, for the alleged debtor.

Winston & Strawn by Cory E. Friedman and David B. Shemano, New York City, for MTB Banking Corp.

## DECISION ON MOTION TO DISMISS INVOLUNTARY PETITION

TINA L. BROZMAN, Bankruptcy Judge.

Elsa Designs, Inc. (Elsa), seeks dismissal of the involuntary petition filed against it under Chapter 7 of the Bankruptcy Code on the grounds that this court lacks jurisdiction because the petitioning creditors' claims are the subject of a *bona fide* dispute.[1] The petitioning creditors

---

1. Elsa improperly styled its motion as one for summary judgment. From the relief which was sought it is clear that the motion was actually a motion pursuant to Fed.R.Civ.P. 12(b)(1) and

cross-move for summary judgment striking the defense of Elsa alleging that no *bona fide* dispute exists and granting an order for relief.

Elsa, which is not presently operating, is a manufacturer and importer of women's and girls' clothing and accessories which in past years has grossed in excess of $1 million in annual sales. The four petitioning creditors are Davidkay Corp., Elsa's landlord; Meri Textile Mills Corp. (Meri) and Safeline Shoulder Pad Co., Inc. (Safeline), two purported suppliers of Elsa; and MTB Banking Corporation (MTB), the assignee of Elsa's lender.

DISCUSSION

■ The commencement of an involuntary Chapter 7 case against a debtor which has 12 or more creditors requires three or more entities as petitioning creditors, each of which holds a claim against the debtor that is not contingent as to liability or the subject of a *bona fide* dispute and which claims aggregate at least $5,000 more than the value of any liens against the debtor's property which the petitioning creditors may hold. 11 U.S.C. § 303(b)(1); *In re Braten*, 86 B.R. 340 (Bankr.S.D.N.Y.1988). The phrase "not ... the subject of a bona fide dispute" is both an element of the condition upon which a controverted order for relief may be entered and a necessary prerequisite for the bankruptcy court's jurisdiction. *In re Onyx Telecommunications, Ltd.*, 60 B.R. 492, 496 (Bankr.S.D.N.Y.1985). Where there is a challenge to the court's jurisdiction in an involuntary case, it is the burden of the party alleging jurisdiction to establish it. *In re Secured Equipment Trust of Eastern Air Lines, Inc.*, 153 B.R. 409 (Bankr.S.D.N.Y.1993). The petitioning creditor must establish a *prima facie* case that no *bona fide* dispute exists. Once this is done, the burden shifts to the debtor to present evidence demonstrating that a *bona fide* dispute does exist. *Rimell v. Mark Twain Bank (In Re Rimell)*, 946 F.2d 1363, 1365 (8th Cir.1991), *aff'd*, — U.S. —, 112 S.Ct. 2275, 119 L.Ed.2d 202 (1992); *Bartmann v. Maverick Tube Corp. (In re Bartmann)*, 853 F.2d 1540, 1544 (10th Cir.1988).

■ Although § 303(h) suggests that a trial will be conducted to determine whether an involuntary petition is properly filed, if the court documents and arguments clearly establish that a claim is or is not subject to a *bona fide* dispute, a trial is unnecessary to determine whether the petition is jurisdictionally defective. *In re B.B.S.I. Ltd.*, 81 B.R. 227 (Bankr.E.D.N.Y. 1988). *Cf., In re Onyx Telecommunications, Ltd.*, 60 B.R. at 496 (the court is free to determine factual disputes and reach the merits of a subject matter jurisdictional dispute without a formal trial). Motions to dismiss and motions for summary judgment are both procedural vehicles available for the adjudication of involuntary bankruptcy petitions. Fed.R.Bankr.P. 1011(b) and 1018; *In re Tikijian*, 76 B.R. 304, 313 (Bankr.S.D.N.Y.1987).

The term "bona fide dispute" is among several amorphous phrases used by the drafters of the Bankruptcy Code to trigger important rights under Title 11. As with § 1112(b)'s "cause" and § 361's "adequate protection", no statutory definition is provided to explain the term which figures so prominently in the filing and dismissal of involuntary petitions. The most that can be divined of Congress' intent in amending § 303 to include the language is found in the comments of Senator Baucus, the proponent of the 1984 amendment, who explained that the Bankruptcy Code should not be used "as a club against debtors who have bona fide questions about their liability but who would rather pay up than suffer the stigma of involuntary proceedings." 130 Cong.Rec. S. 7618 (daily ed. June 19, 1984). A number of courts attempting to reduce § 303's amended language to a workable judicial standard has opted for the following test:

> if there is a genuine issue of material fact that bears upon the debtor's liabili-

---

Fed.R.Bankr.P. 1011 to dismiss for lack of jurisdiction on the basis that the claims of the petitioning creditors are subject to *bona fide* dispute. Since Elsa raised the same defense in its answer (thereby preserving it), I am overlooking the procedural irregularity and treating the motion as one to dismiss on the grounds asserted.

ty, or a meritorious contention as to the application of law to undisputed facts, then the petition must be dismissed. *In re Busick*, 831 F.2d 745, 747 (7th Cir. 1987), *quoting, In re Lough*, 57 B.R. 993 (Bankr.E.D.Mich.1986); *accord, In re Bartmann*, 853 F.2d 1540; *B.D.W. Assoc. Inc. v. Busy Beaver Bldg. Centers, Inc.*, 865 F.2d 65, 66 (3d Cir.1989); *In re Rimell*, 946 F.2d at 1363; *In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr.N.D.Tex.1991); *In re Braten*, 86 B.R. at 340. Under this standard it must be determined whether there is an objective basis for either a substantial factual or legal dispute as to the validity of the debt. *Busick*, 831 F.2d at 750; *In re Nargassans*, 103 B.R. 446, 449 (Bankr.S.D.N.Y.1989).

▮ This Circuit, prior to the 1984 amendment, held that in order to qualify a claimant as a petitioning creditor, "a claimant need not make out a case warranting summary judgment.... It is sufficient to establish that there are good grounds for the claim and that no defenses have been asserted in substantial form." *See, In re Nargassans*, 103 B.R. at 449, *citing, In re B.D. Int'l. Discount Corp.*, 701 F.2d 1071, 1077 (2d Cir.), *cert. denied*, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983). *See also In re Tampa Chain Co., Inc.*, 35 B.R. 568, 575 (Bankr.S.D.N.Y.1983). The 1984 amendment effectively codified the Second Circuit's interpretation of when a creditor may be a proper petitioner in an involuntary case. *Nargassans*, 103 B.R. at 449. In applying this standard, the petitioning creditor must establish a *prima facie* case that no *bona fide* dispute exists. Once this is done, the burden shifts to the debtor to present evidence demonstrating that a *bona fide* dispute does exist. *In re Rimell*, 946 F.2d at 1365; *In re Ross*, 63 B.R. 951, 960 (Bankr.S.D.N.Y.1986) (defined "bona fide dispute" as an "honest conflict"

or "good faith controversy"). Thus, the aim of the court's review of the various petitioning creditors' claims, which may necessarily encompass consideration of the alleged debtor's factual points as well as its legal ones, is to determine whether the alleged debtor's position as to each of the petitioning creditor's claims has any genuine and objectively determinable legal merit. *Id.; see also Bartmann*, 853 F.2d at 1544 (although the court is not to resolve the dispute, it may be required to conduct a limited analysis of the legal issues in order to ascertain whether an objective legal basis for the dispute exists). The determination as to whether a dispute is *bona fide* will often require an assessment of the witnesses' credibilities and other factual considerations. *In re Rimell*, 946 F.2d at 1365; *see also B.D.W. Assoc.*, 865 F.2d at 68.[2] Indeed, this case presented just that necessity, as a result of which I conducted an evidentiary hearing in aid of my determination as to whether jurisdiction exists.

### A. De Minimis Claims

▮ At my direction, Elsa filed a list of its creditors pursuant to Bankruptcy Rule 1003. Although Elsa listed a total of 34 creditors, the petitioning creditors argue that for the purposes of § 303(b)(2) Elsa has only nine creditors because I must ignore the claim of Marcus Elrod as well as all the disputed and *de minimis* claims. Since Elrod is an insider by virtue of his status as principal and sole shareholder of Elsa, his claim is not counted for the purpose of § 303(b). I do not agree, however, that the *de minimis* claims should not be counted notwithstanding that it might make a great deal of sense to amend the Bankruptcy Code to so provide.

▮ Most of the cases that hold that small recurring claims are to be excluded

---

**2.** There is an analogy in another area of federal jurisdiction, diversity jurisdiction. As with the issue of a *bona fide* dispute, the court must evaluate an underlying dispute to determine whether the amount in controversy is sufficient for jurisdiction to be conferred, but the court is not to determine the dispute on the merits. In deciding whether the amount in controversy requirement is satisfied, the court may look to the entire record, including oral testimony, depositions, affidavits, requests for admission, other evidence, and inferences flowing from the lack of evidence. 1 J. Moore et al., *Moore's Federal Practice*, ¶ 0.92[4] at 855–56 (2d ed. 1992); *see Gilbert v. David*, 235 U.S. 561, 568, 35 S.Ct. 164, 166, 59 L.Ed. 360 (1915); *Kantor v. Comet Press Books Corp.*, 187 F.Supp. 321, 322 (S.D.N.Y.1960).

from the creditor count were decided under § 59 of the former Bankruptcy Act which provided an explicit guide for purposes of determining the number of creditors. While § 59e did not specifically exclude creditors with small recurring claims, the courts found Congressional intent to do so in § 56c of the Act which provided that "[c]laims of $50 or less shall not be counted in computing the number of creditors voting or present at creditors' meetings, but shall be counted in computing amount." 11 U.S.C. § 92 (repealed); *Denham v. Shellman Grain Elevator, Inc.*, 444 F.2d 1376 (5th Cir.1971). These courts reasoned that since a creditor holding a claim of less than $50 would be unable to participate at a creditors' meeting, Congress must similarly have intended that such a creditor be unable to be a petitioning creditor in an involuntary bankruptcy. *In re Hoover*, 32 B.R. 842, 847 (Bankr.W.D.Okla.1983).

Section 56c, however, has no counterpart under the Code and Rule 2007 of the Federal Rules of Bankruptcy Procedure has deleted the provision in its forerunner, Bankruptcy Rule 207, which prohibited a holder of a claim less than $100 from voting at a creditors' meeting. As the *Hoover* court explained, under the broad definition of claim as provided in 11 U.S.C. § 101(5) "it would stretch judicial interpretation to the breaking point to read into the definition an exception based on the amount of the claim. If a creditor has a claim, and the creditor is not one that would be excluded pursuant to the provisions of § 303(b)(2), then that creditor should be counted in determining the sufficiency of a petition filed under that section." *Id.* at 848. Since Congress has limited the exclusions to those enumerated in § 303(b)(2) of the Code, courts are constrained to count the small claims. *In re Okamoto*, 491 F.2d 496, 498 (9th Cir.1974) (Congress having made no distinction between large and small claims, the court cannot arrogate the power to do so and thereby engraft an additional exception to the Act); *see also, In re Skye Marketing Corp.*, 11 B.R. 891 (Bankr.E.D.N.Y.1981); *In re Murray*, 14 F.Supp. 146 (W.D.N.Y.1936); *In re Reid*, 107 B.R. 79 (Bankr.E.D.Va.1989).

The Seventh, Eighth and Ninth Circuits have also declined to follow the *de minimis* rule. While acknowledging that there are good policy reasons for excluding small, recurring claims, "[C]ongress has not specifically authorized exclusion, and in the absence of any indication that Congress intended this exclusion, we have no authority to engraft it onto those that Congress expressly provided ... We hold that bona fide small, recurring claims must be included in the § 303(b) count." *In re Rassi*, 701 F.2d 627, 632 (7th Cir.1983); *In re Okamoto*, 491 F.2d 496; *Grigsby–Grunow Co. v. Hieb Radio Supply Co.*, 71 F.2d 113 (8th Cir.1934); *Theis v. Luther*, 151 F.2d 397 (8th Cir.1945), *cert. denied*, 327 U.S. 781, 66 S.Ct. 681, 90 L.Ed. 1009 (1946); *cf. In re Runyan*, 832 F.2d 58 (5th Cir.1987) (typically, creditors excluded for § 303(b) purposes are those with claims less than $25); *In re Blaine Richards & Co.*, 10 B.R. 424 (Bankr.E.D.N.Y.1981) (although $19 bill was *de minimis*, $254 debt was not). There is a pragmatic reason not to engage in judicial legislation here—for what is *de minimis* in one case may not be in another. Involuntary petitions in which the alleged debtor has debts in excess of $100,000,000 are a commonplace in this court. In the context of such a case, a claim as large as $5,000 (if not larger) could be considered *de minimis* whereas in another case such a claim would be sizeable. In the absence of an expression from Congress as to what it considered *de minimis*, it would indeed be difficult to pick a number below which a claim would not be counted.

Since creditors with claims less than $750 (the arbitrary demarcation which the petitioning creditors suggest) should be included in determining the number of Elsa's creditors, three petitioning creditors are required to invoke the jurisdiction of this court.

**B.** *Meri and Safeline*

 Meri and Safeline are separate and distinct corporations under common ownership. Meri claims that during the period August 13, 1991 through October 18, 1991 it sold Elsa over $15,000 worth of product which it delivered, pursuant to Elsa's in-

structions, to a contractor, Piccadilly Modes, in New Jersey. In support of its claim, Meri provided invoices, an itemized statement of account, and documents from UPS called shipper tracer responses.

Safeline, claiming it is owed in excess of $4,000 for product supplied, was unable to produce invoices or receipts, but instead provided a copy of its general ledger, a statement of account dated November 1991, and a copy of a summons and complaint from the state court action it commenced against Elsa in December 1991.

In its answer, Elsa denied ever ordering or receiving any goods from either company, and claimed that it did no business whatsoever with Piccadilly Modes, the company which received the goods shipped by Meri. Elsa posits that Meri was "duped or conned" by another entity using Elsa's name. Elrod, the sole shareholder and officer of Elsa, claimed that he was the only person who placed orders on behalf of Elsa and he categorically denied doing any business with anyone from either company on Elsa's behalf.

The affidavit of service from Safeline's state court action indicates that service of the summons and complaint in that action was made upon one Leon Azouley. Elrod claimed that no such person was ever employed by Elsa Designs nor was any notice ever received by anyone of any purported lawsuit.

Concerned with Elrod's outright denial of ever having done business with either Meri or Safeline, I ordered an evidentiary hearing. The mystery behind these seemingly irreconcilable versions of events, however, was subsequently unveiled in two stages. First it was revealed that Meri and Safeline believed they were doing business with Elsa because they took verbal purchase orders from a "Jacques" or "Jack" who occupied the front office of Elsa's premises.

After a half day of testimony was presented by the petitioning creditors, the existence of the unidentified Jacques, who was not called as a witness on the petitioners' behalf, was explained by Elrod. Early in 1991, Elrod and one Jacques Azouley discussed the possibility of a joint business venture in a company, Jacques Champagne, to sell and design coats. Jacques occupied the front office at Elsa's premises at 212 W. 35th Street on the fourth floor.

Elrod personally lent Jacques $10,000 in return for an eventual 50% share of Jacques Champagne. Elrod insisted, at least in the beginning of the arrangement, that checks issued by Jacques Champagne be signed by both Elrod and Jacques so as to enable Elrod to maintain some control over the expenditure of funds. Because he was absent frequently from the office, travelling to the Orient at least twice a year, Elrod signed a number of blank checks and left them with Jacques. In the summer of 1991, having received some repayment of his loan to Jacques, Elrod determined that he was no longer interested in pursuing a joint venture. Jacques and his business, however, continued to occupy the front office of Elsa's space.

In the spring of 1991, a salesperson for Meri and Safeline received a call from Jacques, who represented that Elsa was interested in purchasing linings and other items from the two companies. The salesperson called on Jacques at 212 W. 35th Street. Jacques gave him a financial report of Elsa (which Elrod described as having been filched from Elsa's files)[3]. This was the only document received by Meri or Safeline with "Elsa Design, Inc." imprinted on it. Subsequently, Jacques placed several orders with Meri and Safeline in Elsa's name.

Elrod suspected that Jacques had placed at least one order in the name of Elsa, with some company whose identity is unclear, when Elrod discovered a package of fabric swatches addressed to Elsa that Elrod had

**3.** Elsa attempted to introduce a Dunn & Bradstreet report in conjunction with its position that Meri and Safeline made inadequate inquiry about Elsa, as a result of which the companies cannot foist their loss upon Elsa. I sustained the petitioning creditors' objection to the report's admissibility. It is unnecessary to revisit that determination, as Elsa requests, since I am ruling in Elsa's favor on these two claims without considering the Dunn & Bradstreet report.

not ordered. Elrod confronted Jacques and demanded that Jacques cease using Elsa's name.

The initial Meri and Safeline invoices, which were billed and mailed to Elsa, were paid. Most were paid by checks from the account of Jacques Champagne, Inc. None of the checks was imprinted with "Elsa Design, Inc." although that designation was handwritten in the memo section of some of the checks and certain checks were co-signed by Elrod.

Meri and Safeline were not paid for the last four shipments of goods. The invoices for these shipments indicate that the billing address was Elsa's premises but the shipping address was "Piccadilly Downs" in New Jersey. Elrod denies any knowledge of such a company. No one from Piccadilly Downs testified on behalf of the petitioners.

Although there was a sign in the lobby of the building indicating "Jacques Champagne" there was no such sign on the fourth floor. There was, however, a sign on the door of Elsa's premises that read "Elsa Design, Inc."

The petitioners argue that Jacques was an actual agent of Elsa, thereby creating an obligation on the part of Elsa for the amounts owed for all goods shipped. Alternatively, the petitioners argue, they have a valid claim against Elsa by virtue of the theory of agency by estoppel.

The petitioning creditors presented no evidence to indicate that Elsa gave Jacques actual authority to purchase goods on behalf of Elsa. Indeed, the record is to the contrary. So we turn to their backup theory that Elrod's actions, including signing blank checks, allowing Jacques access to Elsa's file, and allowing Jacques to receive the mail, are sufficient to estop Elsa from denying their claims.

Apparent authority is based on the principle of estoppel. It arises where a principal places an agent in a position where it appears that the agent has certain powers which he may or may not possess. If a third person holds the reasonable belief that the agent was acting within the scope of his authority and changes position in reliance on the agent's acts, the principal is estopped to deny that the agent's act was not authorized. *Masuda v. Kawasaki Dockyard Co.,* 328 F.2d 662, 665 (2d Cir. 1964). Where a party seeks to impose liability upon an alleged principal on a contract made by an alleged agent, the party must assume the obligation of proving the agency relationship. It is not the burden of the alleged principal to disprove it. *Hoddeson v. Koos Bros.,* 47 N.J.Super. 224, 232, 135 A.2d 702, 706 (1957).

In order to prove agency by estoppel it is necessary to establish all of the following elements:

1) intentional or negligent acts of commission or omission by defendants created the appearance of authority in their alleged agents;
2) plaintiff acted in good faith in relying upon such appearance of authority; and
3) plaintiff changed its position to its detriment in reliance upon such appearance of authority.

Where these elements are not established there can be no agency by estoppel. *Cullen v. BMW of North America, Inc.,* 490 F.Supp. 249, 253 (E.D.N.Y.1980) *citing Berns & Koppstein Inc. v. Orion Ins. Co.,* 170 F.Supp. 707 (S.D.N.Y.1959).

It is well established under New York law that the existence of apparent authority depends upon a factual showing that a third party relied upon the misrepresentation of an agent because of some misleading conduct on the part of the principal, not the agent. *Cooperative Agricole Groupement de Producteurs Bovin De L'Ouest v. Banesto Banking Corporation,* 1989 WL 82454, *14 (S.D.N.Y.); *Chelsea Nat. Bank v. Lincoln Plaza Towers Associates,* 93 A.D.2d 216, 461 N.Y.S.2d 328, 331 (1st Dep't 1983), *aff'd,* 61 N.Y.2d 817, 473 N.Y.S.2d 953, 462 N.E.2d 130 (1984); *Ford v. Unity Hospital,* 32 N.Y.2d 464, 346 N.Y.S.2d 238, 244, 299 N.E.2d 659, 663–64 (1973). This determination requires a factual inquiry focusing upon the principal's manifestations to the third person. *General Overseas Films, Ltd. v. Robin Int'l. Inc.,* 542 F.Supp. 684, 688–89 (S.D.N.Y.

868

1982) *citing Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co.,* 414 F.2d 750, 756 (9th Cir.1969). While agents are often successful in creating an appearance of authority by their own acts and statements, such an appearance does not create apparent authority. *Karavos Compania Naviera S.A. v. Atlantica Export Corp.,* 588 F.2d 1, 10 (2d Cir.1978).

One who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority. Upon failure to properly determine the scope of authority and in the face of damages resulting from the agent's misrepresentations, "apparent authority" is not automatically available to the injured third party to bind the principal. *Ford v. Unity Hospital,* 346 N.Y.S.2d at 244, 299 N.E.2d at 663–64. A third party with whom the agent deals may rely on the appearance of authority only to the extent that such reliance was reasonable. *Hallock v. State,* 64 N.Y.2d 224, 485 N.Y.S.2d 510, 513, 474 N.E.2d 1178, 1180–81 (1984). The third party claiming reliance on an agent's apparent authority must not fail to heed warning or inconsistent circumstances. *General Overseas,* 542 F.Supp. at 695. The circumstances of the transaction known to the third party must be scrutinized to determine whether the third party fulfilled its primary "duty of inquiry." *General Overseas,* 542 F.Supp. at 684.

Elsa contends that Meri and Safeline's belief that they were doing business with an authorized agent of Elsa was unreasonable particularly since they failed to run a credit check on the company with whom they were doing business; payment of the goods was from a business account of a different entity whose identity was imprinted on the checks; and Elsa had no need for their merchandise as it was not in the business of selling coats, but instead was an importer of ladies' sports clothes.

Whether Elrod's actions constitute negligence so as to allow Jacques to hold himself out as agent and whether the actions of Meri and Safeline in relying on Jacques' "apparent authority" were reasonable are issues which I can not summarily determine. *See AFP Imaging Corp. v. Ross,* 780 F.2d 202, 204 (2d Cir.1985), *cert. denied,* 478 U.S. 1004, 106 S.Ct. 3295, 92 L.Ed.2d 710 (1986) (factual issues concerning apparent authority or authority by estoppel do not lend themselves to summary disposition). The outcome of that litigation is not relevant, unless it could be said, which it cannot, that Elsa's dispute is facially meritless. Accordingly, the standard of § 303(b) is not met; Meri's and Safeline's claims are subject to *bona fide* dispute.

*C. Davidkay*

Davidkay claims it is owed in excess of $52,000 as a result of Elsa's failure to pay rent from July 1991 until it vacated the premises. Although Elsa does not deny its failure to pay rent, it contends that the landlord has no claim against it due to an agreement between the parties that any claim of Davidkay would be eliminated in exchange for Elsa's agreement not to pursue a claim for damages arising from an alleged illegal lockout and destruction of Elsa's offices. In other words, Elsa contends that there was an oral accord between itself and Davidkay satisfying Elsa's obligations under the lease.

The doctrine of accord and satisfaction allows contracting parties to make a new contract discharging all or part of their obligations under the original contract. Accord and satisfaction are accomplished by the promisor's tender of alternative performance in satisfaction of his original obligation and by the promisee's acceptance of such alternative performance. *Ber v. Johnson,* 163 A.D.2d 817, 558 N.Y.S.2d 350, 351 (4th Dep't 1990). However, an accord is not effective as a defense or as a basis of a counterclaim unless, "the promise of the party against whom it is sought to enforce the accord is in writing and signed by such party or by his agent." N.Y.Gen.Oblig.Law § 15–501(2) (McKinney's 1993); *General Building Supply Corp. v. Shapn, Inc.,* 35 A.D.2d 550, 551, 313 N.Y.S.2d 459, 461 (2d Dep't 1970); *Bon Temps Agency, Ltd. v. Towers Organization, Inc.,* 187 A.D.2d 376, 590 N.Y.S.2d 97 (1st Dep't 1992).

As admitted by Elsa, there is no writing evidencing an agreement by Davidkay to forego its claim for rent. Thus, Davidkay is an eligible petitioner. At most, any claim that Elsa may have against the landlord for an "illegal lockout" would, if proven, serve as a setoff against the landlord's claim rather than render the claim subject to *bona fide* dispute. *See, In re Drexler*, 56 B.R. 960, 969 (Bankr.S.D.N.Y.1986) (unlike affirmative defenses, which go to the underlying obligation, the "debtor's assertion of counterclaims, even if of substance, does not render a petitioner's claim subject to a bona fide dispute").

D. *MTB*

■ In April 1990, Intercontinental Credit Corporation Division (ICC), a division of Pan American Trade Development Corp (PATDCO), agreed to advance funds to Elsa pursuant to certain security and loan agreements (the Elsa loan). Elrod guaranteed Elsa's obligations. Pursuant to the security agreement, Elsa granted to ICC a security interest in, among other things, all of Elsa's present and after acquired equipment and inventory and all present and future accounts receivable. This security agreement was supplemented in May, 1990, to further secure and guarantee advances made by ICC. In addition, Elsa entered into a factoring agreement with Capital Factors, Inc. (Capital), assigning all of its rights under the factoring agreement to ICC.

In June, 1991, MTB bought certain loans and the rights running with them from PADTCO, including the Elsa loan. By letter agreement executed by ICC, MTB and Elsa, Elsa acknowledged its obligation to repay MTB for all liabilities previously owed to ICC.

On January 15, 1992, MTB notified Elsa and Elrod of Elsa's default under the loan and security agreements and demanded immediate repayment of $787,330. At approximately the same time, Elsa commenced an action against MTB seeking damages of $2,000,000 for an alleged breach of contract (the Elsa Lawsuit). MTB followed with an action against Elsa and Elrod (the MTB Lawsuit) to collect the amounts owed and to obtain a restraining order as well as the appointment of a receiver to safeguard MTB's collateral. Elsa opposed the motion, but a restraining order was granted. Elsa argues· that the existence of these state court actions in and of themselves renders MTB's claim subject to a *bona fide* dispute. I disagree.

■ Oftentimes the filing of an involuntary petition is preceded by litigation in other courts between the debtor and creditors over collection of the debt. The existence of prepetition litigation is not dispositive as to the *bona fide* dispute determination, as a debtor should not be able to defeat bankruptcy court jurisdiction merely by being litigious. *See, In re Ross*, 63 B.R. 951, 960 (Bankr.S.D.N.Y.1986); *accord In re Onyx Telecommunications, Ltd.*, 60 B.R. at 495. However, the pendency of litigation cannot be discounted entirely. Attention and deference, when appropriate, must be given to any determinations made by the other forum on issues similar to those raised by the debtor in opposition to the entry of an order for relief. *In re Drexler*, 56 B.R. at 970. Here, by agreement, neither party has even filed an answer in the actions.

Elsa's complaint alleges that MTB failed to issue letters of credit in favor of Elsa's suppliers, causing cancellation of Elsa's sales contracts; the return by customers of goods to Elsa which then had to be resold at distress prices; and the inability of Elsa to obtain sufficient goods for its critical "back to school" season of sales. Elsa further alleges that MTB failed to follow through on an oral agreement to provide additional financing to allow Elsa to convert to a domestic manufacturing program.

Elsa does not deny that it is indebted to MTB. Although Elsa denies that it was out of formula with MTB, this "dispute" is premised on the notion that there was no fixed formula. That premise is refuted quite unequivocally by the loan documents themselves. Given that Elsa was in default, MTB was not obligated to continue lending.

The Elsa loan is an asset-based loan that requires Elsa to remain in compliance with

a loan formula based on the value of inventory. Under the terms of the Elsa loan, Capital advanced to Elsa through MTB funds based on accounts receivable. MTB controlled the cash flow to Elsa to insure repayment of the loan and released funds to Elsa for reasonable overhead requirements.

Shortly after MTB purchased the Elsa loan, an MTB examination revealed that the value of Elsa's inventory was significantly less than was represented at the time MTB purchased the loan. An alleged burglary of Elsa's premises in July, 1991, resulting in losses of approximately $240,000 of inventory, further exacerbated the inventory shortage.

During that same month, MTB was informed by Capital, and later by Elrod, that Capital would no longer provide Elsa with advance privileges on Elsa accounts receivable. Elsa, admittedly, was directly collecting accounts receivables on what it called "house accounts" in plain violation of the terms of the loan and factoring agreement. By August, 1991, Elsa was unable to pay down its debt to MTB to comply with the loan terms limiting maximum advances.

Elrod claims that, in spite of this, MTB entered into an agreement with Elsa in August, 1991, to pay the custom broker to release imported goods and to provide new financing for Elsa's proposed domestic manufacturing program. Elsa suggested that this reflected an agreement to enter into a new financing. However, MTB has shown and Elsa has not refuted that the terms proposed by MTB for new financing were never agreed to by Elsa nor approved by MTB's board of directors. *See In Re Rimell*, 946 F.2d at 1366 (the parties did not, either orally or through prior course of dealing, agree to alter, extend or modify the existing written contractual terms on any of the loans ... Given that the parties did not agree to such terms, it follows that there could be no *bona fide* dispute). MTB admits that the parties were discussing a new financing predicated upon Elsa's first reducing to $600,000 the balance on its loan. But it is undisputed that Elsa never achieved this level of debt.

Significantly, the Elsa loan agreement, at paragraph 15, specifically provides that

[n]either this agreement, nor any Security Agreement or Guaranty, may be varied, modified or amended except by an instrument in writing duly signed by the parties thereto.

The effect of this provision is set forth in § 15–301 of the New York General Obligations Law which provides that a written agreement which contains such a clause cannot be changed by an executory agreement unless such agreement is in writing and signed by the parties. N.Y.Gen. Oblig.Law § 15–301 (McKinney's 1992). If the only proof of an alleged agreement to deviate from a written contract is an oral exchange between the parties, the writing controls. Thus, the authenticity of any amendment is ensured. *Nanuet National Bank v. Rom*, 96 A.D.2d 898, 466 N.Y.S.2d 68, 69 (2d Dep't 1983); *Columbia Broadcasting System, Inc. v. Roskin Distributors, Inc.*, 31 A.D.2d 22, 294 N.Y.S.2d 804, 808 (1st Dep't 1968), *aff'd.*, 28 N.Y.2d 559, 319 N.Y.S.2d 449, 268 N.E.2d 128 (1971). *See also, In re Tikijian*, 76 B.R. at 321 (court refused to deny petitioners' motion for summary judgment "merely because [the alleged debtor] [had] proffered some parol evidence bearing on the claims of the various petitioners").

Although I am not to resolve any dispute, I am not prohibited from addressing the legal merits of the alleged dispute. *In re Bartmann*, 853 F.2d at 1544. In light of the fact that the debtor admittedly is indebted to MTB on the Elsa loan and is unable on this record to show an oral agreement either to modify the existing loan or to provide new financing, Elsa's claims against MTB are legally insufficient to render MTB's claims subject to a *bona fide* dispute.

### E. *Joinder of another creditor*

After the hearing on this matter but prior to the issuance of this decision, the petition was joined by a fifth creditor whom Elsa had listed on its schedules as holding an undisputed claim. Thus, the involuntary petition is properly supported

by the requisite number of petitioning creditors.

## CONCLUSION

■ Some courts have proposed use of a balancing test in which the bankruptcy court is to balance the interests of creditors against those of the debtor before entering an order for relief on an involuntary petition if the debtor disputes the petitioners' claims. *In re Drexler*, 56 B.R. 960, 971 (Bankr.S.D.N.Y.1986) (citations omitted). Although Congress intended the Bankruptcy Code as a shield for debtors, not a sword for creditors, it is equally apparent that it was not the intention of Congress that a debtor be able to avoid bankruptcy by merely disputing the existence or amount of a claim. Furthermore, creditors are entitled to a speedy determination so that if the debtor is generally not paying its debts, creditors rights can be protected and the debtor can be prevented from wasting creditors' assets. *Id., citing In re R.N. Salem Corp.*, 29 B.R. 424, 429 (S.D.Ohio 1983).

Here, Elsa is no longer operating and its assets are being stored in a public warehouse. Elsa also has claims for its stolen inventory pending with its insurance company. Since the business is moribund and assets exist, Elsa is a classic candidate for involuntary bankruptcy relief. Under those circumstances, the equities tip most decidedly in favor of the creditors.

The motion to dismiss the involuntary petition is denied. The petitioning creditors' cross-motion for summary judgment for an order for relief is granted.

SETTLE AN ORDER CONSISTENT WITH THIS DECISION.